Sheri L. Kelly, SBN 226993
E-mail: slk@sherikellylaw.com
**LAW OFFICE OF SHERI L. KELLY**
31 E. Julian Street
San Jose, CA 95112
Telephone:    (408) 287-7712
Facsimile:    (408) 583-4249

Counsel for Plaintiffs
[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

**WHA**

| | |
|---|---|
| DANNY LANE and BEVERLY LANE, individually, and for all other persons similarly situated<br><br>          Plaintiffs,<br><br>     v.<br><br>WELLS FARGO BANK, N.A., and QBE AMERICAS, INC.<br><br>          Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**1. BREACH OF CONTRACT, INCLUDING THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**2. UNJUST ENRICHMENT**<br><br>**3. CONVERSION**<br><br>**4. BREACH OF FIDUCIARY DUTY**<br><br>**5. VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601** *et seq.*<br><br>**6. VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200,** *et seq.*<br><br>**7. VIOLATIONS OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT, 12 U.S.C. § 2601,** *et seq.*<br><br>**8. EQUITABLE RELIEF**<br><br>**[JURY TRIAL DEMANDED]** |

Plaintiffs Danny Lane and Beverly Lane, acting individually and on behalf of all others similarly situated, for their Class Action Complaint and demand for jury trial, state and allege as follows:

## NATURE OF THE ACTION

1.     This is an action seeking damages and other relief against Wells Fargo Bank, N.A. ("Wells Fargo" or "Wells"), and QBE Americas, Inc. ("QBE") for wrongful and collusive business practices relating to force-placed flood and hazard insurance.

2.     Wells Fargo is among the country's largest residential mortgage lenders and loan servicers. The mortgages Wells Fargo services require the borrowers to maintain acceptable flood and hazard insurance on the residential property securing their loans. When borrowers do not obtain insurance coverage in the amounts Wells Fargo requires, it exercises its right to purchase insurance for the borrower. This is standard and appropriate. Such purchase of insurance by the lender is commonly known as "force-placement."

3.     What is not standard and appropriate is the exploitative and self-dealing arrangement Wells Fargo engages in when it purchases force-placed insurance. Wells Fargo entered into an exclusive purchase arrangement with QBE. Under this agreement, Wells agreed to purchase every force-placed insurance policy for homeowners with home mortgages from QBE. In return, QBE contractually agreed to pay Wells Fargo or its affiliates a kickback equal to 10% to 20% of the premium for every force-placed insurance policy. This arrangement is an exclusive arrangement, meaning that Wells Fargo purchases all force-placed insurance from QBE and does not seek competitive bids for insurance policies. This arrangement is never disclosed to borrowers.

4.     Wells Fargo's servicing responsibilities such as tracking insurance coverage on borrower's properties, sending notices related to insurance coverage issues, and force-placing insurance are performed by QBE. Borrowers foot the bill for this outsourcing arrangement when they pay exorbitant force-placed insurance premiums, including Wells Fargo's kickbacks, to QBE.

5.     Wells Fargo uses its sister corporation, Wells Fargo Insurance, Inc., as the "agent" that gets paid for "finding" and placing the force-placed insurance. But there is no "finding"

involved. No typical insurance agent services that would entitle an agent to a commission are performed. Wells already has written contracts with QBE where it is agreed that *all* force-placed insurance for Wells Fargo's borrowers will be purchased from QBE. These agreements provide that QBE will pay 10%-20% rebates as "commissions," which are actually just kickbacks.

6.      Wells Fargo charges borrowers' mortgage escrow accounts for force-placed insurance premiums, including its kickbacks, and increases borrowers' mortgage payments to pay the premiums and kickbacks. If the borrower refuses or fails to pay, Wells Fargo adds the premiums to borrower's mortgage balance and charges the borrower interest on these charges, creating a new loan. The purpose of force-placed insurance is to protect the lender's interest in the property securing a mortgage. The purpose is not to gouge the borrower solely to profit the mortgage servicer. The purpose is not to shift the cost of the mortgage servicer's operations—such as keeping up with the status of borrowers' insurance coverage, sending notices about deficient coverage, and the like—to the borrower by outsourcing these operations to an insurance company that charges two to ten times the going rate for insurance.

7.      Wells Fargo requires all borrowers with loans it services to maintain flood insurance equal to the "replacement cost value" of the borrower's property. That is, Wells requires borrowers to maintain enough flood insurance to rebuild the property in the event that a flood completely destroys it. If the borrower does not maintain this amount of insurance, Wells force-places insurance up to the replacement cost value of the property or $250,000 (the federal maximum for flood insurance), whichever is less. Regardless of the propriety of maintaining replacement cost value coverage, no borrower's mortgage authorizes the servicer to force-place insurance in excess of the borrower's mortgage balance. The purpose of force-placed insurance is only to protect the lender's interest in the property, which is the outstanding principal balance on the loan. For example, in 2011 Plaintiffs were force-placed into a flood insurance policy that resulted in at least $52,000 of flood insurance. The principal balance on their mortgage in 2011 was approximately $28,000. Wells Fargo force-placed Plaintiffs into a flood insurance policy that, at the very least, provided $24,000 more coverage than their mortgage balance. This practice of requiring "excess" insurance is not

necessary to protect Wells Fargo's interests. If a loss to the property occurred by reason of flood and the Plaintiffs maintained only $28,000 in insurance, the policy's proceeds would pay off their mortgage, and the lender would be fully protected. Force-placing more is unlawful and breached Plaintiffs' mortgage.

8.      Likewise, Wells Fargo requires all borrowers with loans it services to maintain hazard insurance equal to the "replacement cost value" of the borrower's property. That is, Wells requires borrowers to maintain enough hazard insurance to rebuild the property in the event it is completely destroyed.  If the borrower does not maintain this amount of insurance, Wells force-places insurance up to the replacement cost value of the property. Regardless of the propriety of maintaining replacement cost value coverage, no borrower's mortgage authorizes the servicer to force-place insurance in excess of the borrower's mortgage balance. The purpose of force-placed insurance is only to protect the lender's interest in the property, which is the outstanding principal balance on the loan. For example, in 2011 Plaintiffs were force-placed into a hazard insurance policy that resulted in at least $52,000 of hazard insurance. The principal balance on their mortgage in 2011 was approximately $28,000. Wells Fargo force-placed Plaintiffs into a hazard insurance policy that, at the very least, provided $24,000 more coverage than their mortgage balance. This practice of requiring "excess" hazard insurance is not necessary to protect Wells Fargo's interests. If a loss to the property occurred and the Plaintiffs maintained only $28,000 in insurance, the policy's proceeds would pay off their mortgage, and the lender would be fully protected. Force-placing more is unlawful and breached Plaintiffs' mortgage.

9.      Plaintiffs allege that (1) Defendants force residential borrowers to purchase and/or maintain insurance in excess of the amounts required by federal law, in amounts greater than the note owner's secured interest in the property, and contrary to the amounts agreed upon in the relevant loan and mortgage documents; and (2) Defendants derive an improper financial benefit by charging residential borrowers for the "cost" of procuring force-placed insurance from QBE when a portion of such "cost" is returned, transferred or paid to Wells Fargo or an affiliate. Wells characterizes these hidden costs as "commissions," or otherwise earned, but in reality they are

1  unearned kickbacks.[1]

2      10.   Wells Fargo's practices alleged in this Complaint constitute a breach of contract,

3  including the implied covenant of good faith and fair dealing, violate the fiduciary duty it has with

4  respect to the management and use of borrowers' escrow funds, violate the Truth in Lending Act

5  ("TILA") and the Real Estate Settlement Procedures Act ("RESPA"), violate California Bus. &

6  Prof. Code § 17200, unjustly enriched the defendants, and constitute an act of conversion. QBE's

7  actions alleged in this Complaint constitute unjust enrichment, a violation of RESPA, and a

8  violation of California Bus. & Prof. Code § 17200.

9      11.   Plaintiffs seek to recover damages equal to the amount of the improper and

10  inequitable financial benefit received by Wells or its affiliate as a result of this anti-consumer

11  practice, treble damages pursuant to RESPA, and to enjoin the future collection of amounts charged

12  against the mortgage accounts of residential borrowers but not yet collected.

13  **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

14      12.   This Court has jurisdiction over this action under the Class Action Fairness Act of

15  2005, 28 U.S.C. §§ 1332(d)(2) and (6), because the aggregate claims of the putative Class members

16  exceed $5 million, exclusive of interest and costs, and because at least one Plaintiff is a citizen of a

17  different state than Wells Fargo.

18      13.   This Court also has original jurisdiction over Plaintiffs' federal claims pursuant to 28

19  U.S.C. § 1331. Plaintiffs' state law claims arose out of the same transaction and occurrence as their

20  RESPA and TILA claims and are so related to Plaintiffs' RESPA and TILA claims that they form

21  part of the same case or controversy.

22      14.   Venue is proper in this district pursuant to 28 U.S.C. § 1391, because Wells Fargo is

23  subject to personal jurisdiction here, because its principal place of business is 420 Montgomery

24  Street, San Francisco, California 94163, and because a substantial part of the acts or omissions

25  giving rise to the claims herein occurred and continue to occur in this district.

26

27  [1] **Kickback,** *n.* (1920) A return of a portion of a monetary sum received, esp. as a result of coercion or a secret agreement." Black's Law Dictionary (9th Ed. 2009).

**PARTIES**

15.     Danny Lane and Beverly Lane are, and, at all relevant times have been, residents of Arkansas County, Arkansas.

16.     Proposed Class members are residents of the United States.

17.     Defendant, WELLS FARGO BANK, N.A. ("Wells Fargo Bank") is a national bank registered to do business in the State of California with its principal address in San Francisco, California. As a result of a 2004 merger, Wells Fargo Bank is the successor to Wells Fargo Home Mortgage, Inc., which no longer exists. Wells Fargo Bank sometimes does business under the name Well Fargo Home Mortgage.

18.     Defendant QBE Americas, Inc. is headquartered in New York, New York and is licensed to transact business in California. It owns a number of insurance companies, some of which are involved in force-placing insurance for Wells Fargo. QBE Americas, Inc. and its subsidiaries are referred to collectively herein as "QBE."

**FACTUAL ALLEGATIONS**

**A.     Wells's Role as Servicer**

19.     Wells Fargo provides services including, but not limited to, banking, insurance, investments, mortgage, and consumer and commercial finance across North America. It services approximately 9 million mortgages, and has assets of $1.2 trillion.

20.     As servicer, Wells Fargo's responsibilities included sending monthly mortgage statements, collecting monthly mortgage payments, collecting and maintaining escrow accounts for the payment of insurance on properties used to collateralize loans, paying for such insurance on those properties from borrower's escrow accounts, monitoring and ensuring that all required forms of insurance are in full force and effect, notifying borrowers of insurance lapses and other required actions, procuring and paying for force-placed insurance, and accounting for and remitting borrowers' payments to Wells Fargo.

21.     Wells Fargo is delegated these responsibilities as a mortgage servicer by the lender, or note holder, for millions of mortgages. Wells Fargo, in turn, outsources many of these

responsibilities to third parties. Wells Fargo delegates many of its insurance-related responsibilities to QBE and other companies owned by QBE.

### B. QBE's Role as an Outsourcer and Insurance Company

22.     Wells Fargo outsources many of its servicing responsibilities described above to QBE, or one of its other subsidiaries. Under this outsourcing arrangement, QBE monitors borrowers' insurance coverage, send letters on Wells Fargo letterhead stating when borrowers need to increase their flood insurance coverage, and force-place coverage on borrowers' property if the borrowers do not obtain sufficient coverage to meet Wells Fargo's requirements.

23.     As part of this "bundle" of services, Wells Fargo also authorizes QBE to purchase every force-placed policy for Wells Fargo's borrowers with QBE. In return for this lucrative business, every time QBE force-places an insurance policy on one of Wells Fargo's borrowers' property, it pays a portion of the premium to Wells Fargo, or its affiliate Wells Fargo Insurance, Inc.

### C. Facts as to Danny Lane and Beverly Lane.

24.     On or about April 25, 2001, Plaintiffs obtained their mortgage loan from Freedom Financial Services of Arkansas, Inc. The principal balance of their mortgage at closing was $41,150. After the closing of the loan, the note and mortgage were ultimately purchased by Wells Fargo. A true and correct copy of the mortgage is attached as **Exhibit A**.

25.     Pursuant to the mortgage, Plaintiffs are required to insure the improvements on the real property:

> 5.     Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included with the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires…The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably…

> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrowers expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

(Emphasis added)

26.     Plaintiffs' mortgage was a Fannie Mae/Freddie Mac form mortgage. Most of the mortgages Wells Fargo serviced during the Class period were, likewise, Fannie Mae/Freddie Mac mortgages written on forms that contained provisions regarding property insurance that were substantially similar to those in Section 5 of Plaintiffs' mortgage.

27.     While this standardized provision states that the "cost of the [force-placed] insurance so obtained might significantly exceed the cost of insurance that Borrower could have obtained," it does not authorize or contemplate that Wells Fargo or an affiliate will derive a hidden profit or financial benefit by procuring force-placed insurance from QBE. Nor does it authorize Wells Fargo to add these hidden kickbacks as additional debt of the borrower.

28.     Plaintiffs' home was located in a Special Flood Hazard Area, as defined by federal regulations, at the time they entered into the mortgage. Plaintiffs signed a "Flood Zone Notification" at the time they entered into their mortgage. This notice stated that Plaintiffs were required to

maintain flood insurance that "must cover **the lesser of**: (1) the outstanding principal balance of the loan; or (2) the maximum amount of coverage allowed for the type of property under the NFIP. Flood insurance coverage under the NFIP is limited to the overall value of the property securing the loan minus the value of the land on which the property is located."

29.     Likewise, at the time they entered into the mortgage, Plaintiffs signed a "Hazard Insurance Authorization & Requirements" form.  This form stated that Plaintiffs were required to maintain hazard insurance that "must be in an amount at **least** equal to the replacement value of improvements on the property or the loan amount."

30.     Wells Fargo Home Mortgage began servicing Plaintiffs' mortgage on or about April 25, 2001 and continued to do so until Wells Fargo Home Mortgage and Wells Fargo merged. Since the merger, Wells Fargo has serviced Plaintiffs' mortgage.

31.     Wells Fargo has incrementally increased the amount of flood and hazard insurance Plaintiffs were required to maintain.

32.     Wells Fargo did not and cannot identify any changes in Plaintiffs' mortgage or circumstances that justified its unilateral decision to increase the amount of insurance it required Plaintiffs to maintain. The mortgage contract did not require Plaintiffs to maintain flood or hazard insurance in an amount greater than the principal balance of the mortgage loan, and Plaintiffs' existing coverage was adequate under federal law and the mortgage agreement.

33.     For example, on September 9, 2011, Wells Fargo force-placed Plaintiffs into $52,000 of flood insurance.  On that same day, Wells Fargo force-placed Plaintiffs into a separate hazard insurance policy in the amount of $52,000.  Both policies were placed with QBE.

34.     At the time Wells Fargo force-placed these policies, Plaintiffs' mortgage balance was significantly below this amount. Although documents in Defendants' possession—such as mortgage statements—will be necessary to verify the amount of excessive coverage, Plaintiffs' original principal balance at the time of closing on their mortgage was $41,150 and the total principal balance on the mortgage on September 9, 2011, was approximately $28,000.

35.     Plaintiffs lack administrative remedies to address the wrongful conduct alleged

1 | herein.

2 | 36.   All conditions precedent to the relief sought herein have been performed, occurred or
3 | been waived.

4 | **D.   Facts Common to the Classes**

5 | 37.   Each and every mortgage at issue in this litigation is serviced by Wells Fargo and
6 | requires borrowers, including Plaintiffs, to maintain flood and hazard insurance on their real
7 | property. If the borrower fails to maintain the requisite insurance, the mortgage servicer may force-
8 | place insurance on the property.

9 | 38.   These mortgages are standardized residential mortgage instruments that contain
10 | substantially identical provisions regarding flood and hazard insurance and fees that may be
11 | imposed in connection with force-placed insurance to those cited above (section 5 of **Exhibit A**).

12 | 39.   Pursuant to the mortgage contracts at issue, once an insurance policy has lapsed, the
13 | mortgage servicer can purchase insurance for the home, "force-place" it, and then charge the
14 | borrower the full cost of the premium. However, these premiums are not the actual amount that
15 | Wells Fargo pays, because a substantial portion of the premiums are refunded to Wells Fargo
16 | through kickbacks or unwarranted "commissions."

17 | 40.   In accomplishing this force-placement, Wells Fargo, in bad faith, entered into
18 | arrangements with QBE to guaranty that QBE would be the exclusive force-placed insurance
19 | provider for all force-placed policies on mortgages Wells Fargo services. Under this arrangement
20 | Wells Fargo charges exorbitant rates to Plaintiffs and the Classes who have no way of refusing the
21 | force-placed charges. These premium rates or charges were not arrived at on a competitive basis and
22 | were well in excess of those which could have been obtained in the open market by Wells Fargo,
23 | Plaintiffs or the Classes. Accordingly, no good faith arms-length transactions are taking place.

24 | 41.   The premiums on force-placed insurance policies generally cost at least five to six
25 | times, and often up to ten times, more than what the borrower was either originally paying or what
26 | the borrower could obtain if he or she purchased the insurance on a competitive basis on the open
27 | market.

CLASS ACTION COMPLAINT

42. Force-placed insurance policies are extremely lucrative for QBE and generate extremely high profit margins.

43. Wells Fargo and QBE have reaped significant profits relating to force-placed insurance.

44. Wells Fargo receives commissions or kickbacks from QBE once one of the high-priced, force-placed, insurance policies is purchased. These kickbacks are directly tied to the cost of the force-placed insurance and are usually a percentage of the premium for the policy.

45. This kickback arrangement provides the mortgage servicer with an incentive to purchase the highest priced force-placed insurance policy on a non-competitive basis that it can— the higher the cost of the insurance policy, the higher their kickback. Ultimately, the consumer pays the bill. Wells maximizes the amount of its commissions or kickbacks by force-placing borrowers into insurance policies in excess of the amounts required by federal law, in amounts greater than the note owner's secured interest in the property, and contrary to the amounts agreed upon in the relevant loan and mortgage documents.

46. The commission or kickback is paid by QBE to Wells Fargo in order to maintain their pre-existing uncompetitive and exclusive relationship, to induce Wells Fargo to purchase excessively-priced force-placed insurance policies from QBE, and to cause Wells Fargo to not seek competitive bids in the market.

47. The Defendants have entered into an arrangement such that a competitively priced insurance policy is not actually "found" for any given property. Therefore, the notion that any "commission" is due to Wells Fargo or its affiliates is false. Rather, Wells has a pre-set arrangement by which QBE has access to and searches Wells Fargo's database to find lapsed insurance policies. Then QBE writes to the homeowners to notify them of the force-placed coverage. Assuming there is a lapse in coverage, insurance is automatically placed—the provider of the insurance and the cost of the insurance are pre-determined under this relationship. Further, the cost of the insurance for each home bears no relation to each homeowner's individual home. Rather it is pre-determined based upon Well Fargo's entire portfolio of mortgages.

48.     Therefore, Wells Fargo is not just paying QBE for force-placed insurance. It is also paying QBE for a bundle of services, including performing Well Fargo's job of administering and servicing the mortgages (monitoring Wells Fargo's entire portfolio for lapses and providing proper notification to homeowners under the mortgage). This bundle of administrative services includes Wells Fargo's cost of monitoring and servicing its entire portfolio of loans and is not chargeable to Plaintiffs under the mortgages.

49.     Under this arrangement, the "premiums" for insurance that are charged to the Plaintiffs are exorbitant and illegal because they not only include the excessive cost of insurance, but they also include illegal kickbacks and the cost of the bundle of administrative services that QBE is providing to Wells Fargo.

50.     This arrangement insures that QBE is the only entity providing force-placed insurance for Wells Fargo borrowers, with Wells Fargo signing off on the force-placed policies and collecting kickbacks, and the consumer providing the money.

51.     If the consumer cannot afford to pay the exorbitant premiums for force-placed insurance, the premiums are added to the mortgage's principal balance.

52.     In addition, Wells force-places retroactive insurance policies covering periods of time in the past where coverage had lapsed. This is done despite the fact that there are no claims during the lapsed period and the homeowner has since secured standard insurance. Moreover, retroactive force-placed insurance is especially egregious given the fact that the National Association of Insurance Commissioners has stated that insurance is "prospective in nature" and that policies should not be backdated.

53.     The actions and practices described herein represent bad faith and unconscionable practices that, even if the terms of the mortgage could be construed to allow them, would still be an abusive and unlawful exercise of the lender's authority under the contract. Placing these unreasonably, uncompetitively, and excessively priced insurance policies on Plaintiffs and the similarly situated Class Members' mortgages without regard for competition on the open market to obtain a commercially reasonable price, is solely to maximize Wells Fargo's own profits through

kickbacks collected from the exorbitant premiums for force-placed policies. Said conduct is prohibited by state and Federal law.

54.     Wells Fargo is entitled under Plaintiffs' and each Class Member's mortgage to purchase force-placed insurance. Wells Fargo must, however, purchase force-placed insurance in good faith. Indeed, Plaintiffs do not seek to prevent or significantly interfere with Defendants' ability to force place insurance coverage pursuant to the mortgage contracts. Rather, Plaintiffs demand that the Defendants perform their duties in good faith.

55.     Wells Fargo's manipulation of its force-placed insurance purchases has maximized the profits to themselves to the great detriment of Plaintiffs and the Classes.

56.     Wells Fargo was not, and is not, authorized by any federal, state, or local governing body, contract, or agreement to manipulate its force-placed insurance purchases in bad faith as alleged above.

57.     Furthermore, these fraudulent practices have recently come under fire by all fifty State Attorneys General as part of a nationwide investigation. As the State Attorneys General have recognized, this practice has greatly contributed to the foreclosure crisis.

**E.     Facts Supporting Equitable Tolling**

58.     Plaintiffs' RESPA and TILA claims are timely.   To the extent that any Class Member's claims accrued outside the applicable statute of limitations, these claims are subject to equitable tolling.

59.     Class Members' claims are subject to equitable tolling because they could not, despite the exercise of due diligence, have discovered the underlying basis for their claims against Defendants. Defendants, through Wells Fargo's notices to Plaintiffs and Class Members, actively and knowingly concealed the basis for Class Members' claims by engaging in a scheme that was self-concealing by its very nature and design. Any delay by Plaintiffs or Class Members in raising claims against Defendants was, therefore, excusable.

60.     Due to the complex, undisclosed and self-concealing nature of Defendants' scheme to collect kickbacks from QBE, Class Members whose claims accrued outside the statute of

limitations did not possess sufficient information or the requisite expertise to enable them to discover the true nature of Defendants' unlawful kickback scheme. Plaintiffs and Class Members had no basis upon which to investigate the validity of any of Wells Fargo's commissions.

61.     Additionally, Wells Fargo engaged in affirmative acts to conceal the facts and circumstances giving rise to the claims asserted herein. In fact, Wells Fargo's form letters to borrowers regarding force-placed insurance affirmatively misled borrowers about Wells Fargo's relationship with QBE and misrepresented that the so-called commissions paid to Wells Fargo were for services actually performed or expenses actually incurred by Wells Fargo or its affiliate, Wells Fargo Insurance. As stated above, these "commissions" were in fact unearned kickbacks.

62.     Plaintiffs and Class Members did not have sufficient information to put them on notice of the true nature of Defendants' captive reinsurance arrangement with QBE. Defendants intentionally designed its force-placed insurance letters to conceal its kickback arrangement, and to mislead borrowers into believing that Defendants' practices are lawful.

63.     Additionally, information regarding Defendants' kickback scheme has not been publicly available. Upon information and belief, "commissions" for force-placed insurance are not often reported by banks, and captive companies do not have to file the detailed annual reports usually required of commercial insurance companies. *See*, Janis Mara, *Industry News, Wells Fargo, Citibank Under Investigation in Alleged Kickback Schemes*, Mar. 7, 2005, http://www.atla.org/indynews/news.cfm?newsID=2571 ("The annual reports and actuarial reports of Vermont's captives are protected by the state's confidentiality laws and cannot be accessed without a court order by anyone other than a regulator.") Thus, even the most sophisticated borrower could not obtain such information even if he wanted to do so, absent filing a lawsuit and obtaining a subpoena.

64.     The Court should excuse the delay of any Class Members whose claims arose outside the relevant statute of limitations because they did not and could not discover Defendants' wrongful conduct absent specialized knowledge or assistance of counsel. As such, it would be inequitable to apply the statutes of limitations so as to preclude any Class Member's claims.

## CLASS ALLEGATIONS

65.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23(a)(1)-(4) and (b)(3).

66.     The proposed Classes are defined as:

**Force-Placed Class:**

All persons in the United States with a loan serviced by Wells Fargo who, within the applicable statute of limitations through July 31, 2012, were charged for a force-placed flood or hazard insurance policy procured through Defendants (the "Force-Placed Class").

**Subclass: (For Violation of California's Unfair Business Practices Act, Cal. Civ. Code §17200 *et seq.*):**

All individuals in the state of California with a loan serviced by Wells Fargo who, within the applicable statute of limitations through July 31, 2012, were charged for a force-placed flood or hazard insurance policy procured through Defendants. (the "California Sub-Class").

**Excess Insurance Class:**

All persons with a loan serviced by Wells Fargo who, within the applicable statute of limitations through July 31, 2012, were required to purchase or maintain, or on whose behalf Wells Fargo purchased "lender placed" or "force-placed" flood or hazard insurance coverage on their property in excess of their total outstanding loan balance (the "Excess Insurance Class").

67.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

68.    Excluded from the Classes are Wells Fargo, and QBE, their respective parents, subsidiaries, affiliates, officers, employees and directors, as well as any entity in which they have controlling interests, and counsel for Plaintiffs.

69.    The members of the Classes are so numerous that joinder is impractical. The Classes are believed to consist of thousands of members, whose identities are within the exclusive knowledge of and can only be ascertained by resort to the records of Wells Fargo and QBE.

70.    There are questions of law and fact common to Plaintiffs and the Classes that predominate over questions affecting individual Class members. These common questions include:

a.    Whether Defendants breached the mortgage contract with borrowers by charging borrowers a high premium "cost" for force-placed insurance when, in reality, a significant portion of this "cost" was actually returned, transferred, or paid to Wells or an affiliate of Wells;

b.    Whether Defendants breached the implied covenant of good faith and fair dealing by charging their residential borrowers amounts for force-placed insurance procured from QBE or its subsidiaries, a portion of which was returned, transferred or paid to Wells or an affiliate;

c.    Whether Defendants were unjustly enriched by charging their residential borrowers amounts for force-placed insurance procured from QBE or its subsidiaries, a portion of which was returned, transferred or paid to Wells or an affiliate;

d.    Whether Defendants converted funds owned by borrowers by withdrawing such funds from borrowers' escrow accounts and requiring borrowers to pay to replenish their escrow accounts in order to pay the premiums for force-placed insurance procured from QBE or its subsidiaries, a portion of which was returned, transferred or paid to Wells or an affiliate;

e.    Whether Defendants acted unfairly by entering into an exclusive buying arrangement

with QBE and its subsidiaries in order to receive kickbacks of a portion of insurance premiums paid to QBE's subsidiaries for force-placed insurance policies;

f. Whether Defendants' kickbacks are unlawful fee splits prohibited by RESPA; and

g. Whether Defendants should be enjoined from continuing to receive kickbacks from QBE and its subsidiaries, and withdrawing the amounts of these kickbacks from borrowers' escrow accounts.

71. Plaintiffs' claims are typical of the claims of other members of the Classes. Plaintiffs, like all Class members, were charged for force-placed insurance procured without seeking competitive bids on the open market by Wells Fargo from QBE and its subsidiaries to insure property secured by a residential mortgage originated, owned or serviced by Wells. Plaintiffs, like all Class members, sustained damages based on the same actions of Wells and have no interest antagonistic to the interests of any members of the Classes.

72. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of complex litigation and consumer class actions. Plaintiffs and their counsel will fairly and adequately protect the interests of the Classes.

73. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendants, Class members cannot realistically afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, members of the Classes have no realistic likelihood of recovering their damages, and Wells Fargo's wrongful practices alleged herein will continue unabated.

74. Even if members of the Classes could afford to pursue individual litigation, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. In contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive

supervision by a single court. Thus, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually. There will be no difficulty in the management of this action as a class action.

75.     Defendants have acted or failed to act in a manner generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

## CAUSES OF ACTION

## COUNT I

## BREACH OF CONTRACT, INCLUDING THE IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING

### *AGAINST WELLS FARGO ON BEHALF OF BOTH CLASSES*

76.     Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

77.     Wells Fargo's actions constitute a breach of the express terms' of Plaintiffs' mortgage and breach of the implied covenant of good faith and fair dealing.

78.     Section 3 of Plaintiffs' mortgage governs how a mortgage lender should apply funds for items paid out of escrow, such as flood insurance premiums. Paragraph 3 states that the "Lender shall not charge Borrower for holding and applying Funds" to escrowed items. Wells Fargo's kickback scheme violates this provision by charging borrowers a fee, which it calls a "commission," for doing nothing more than paying QBE force-placed insurance premiums.

79.     Section 5 of Plaintiffs' mortgage governs the parties' rights and obligations concerning all forms of homeowners' insurance. Paragraph 5 requires Plaintiffs to obtain flood insurance "in the amounts . . . and for the periods that Lender requires." However, it goes on to state that, if Plaintiffs do not maintain the amount of flood insurance the lender requires, "Lender may obtain insurance coverage, at Lender's option and Borrower's expense," and "such coverage shall cover Lender . . . ." The mortgage deed of trust allows the lender to ask Plaintiffs to obtain insurance in excess of the principal balance of the mortgage, but it does not allow the lender to force-place

insurance in excess of the principal balance of the mortgage.

80.     Section 5 also requires the borrower to acknowledge "that the cost of the [force-placed] Insurance coverage . . . might significantly exceed the cost of insurance that Borrower could have obtained." Wells Fargo's scheme to intentionally inflate the "cost" of this insurance through its exclusive purchasing arrangement with QBE violates this provision. Moreover, Wells Fargo's kickbacks cannot reasonably be construed as part of the "cost" of force-placed insurance. Charging Plaintiffs' for Wells Fargo's kickbacks violates this provision of Plaintiffs' mortgage. Section 5 does not contain the word "commission" or any other explicit or implicit authorization for the payment of any remuneration to Wells or its affiliates for the purchase of force-placed insurance.

81.     Section 9 of Plaintiffs' mortgage governs the Lender's rights when the borrower fails to abide by any covenant contained in the mortgage, including the requirement to maintain adequate insurance. It states that if the borrower does not maintain adequate insurance "Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the property and rights under this Security Instrument . . . ." Wells Fargo's decision to force-place insurance on Plaintiffs' property far above the principal balance of Plaintiffs' mortgage is not "reasonable or appropriate to protect Lender's interest in the property and rights under this Security Instrument." Wells Fargo's decision to force-place insurance with a company that guaranteed it kickbacks is not "reasonable or appropriate to protect Lender's interest in the property and rights under this Security Instrument." These actions violated Plaintiffs' mortgage.

82.     Wells Fargo's insurance requirements also violated the Flood Hazard Notice and Hazard Insurance Authorization & Requirements contracts signed with Plaintiffs' mortgage.

83.     Wells Fargo's excessive insurance requirements, force-placing flood insurance above and beyond the principal balance of Plaintiffs' mortgage, and collusive kickback arrangement with QBE violated the express terms of Plaintiffs' mortgage and disclosures included with Plaintiffs' mortgage.

84.     Wells Fargo breached the express terms of the mortgage contract on September 9, 2011 by (1) requiring Plaintiffs to pay charges for force-placed insurance when a part of these

charges were returned to Wells Fargo or its affiliate, (2) assessing charges to Plaintiffs' mortgage debt for force-placed insurance that exceeded the "costs" of the insurance policy, (3) charging Plaintiffs fees for payment of items paid through Plaintiffs' escrow account, and (4) threatening to force-place and force-placing insurance on Plaintiffs' property in excess of their mortgage principal balance and charging Plaintiffs for this insurance.

85.    The implied covenant of good faith and fair dealing is part of every contract. While the implied covenant cannot override an express contractual term, it attaches to the performance of a specific contractual provision. The duty to act in good faith limits one party's ability to act in a manner that contravenes the reasonable and justifiable expectations of the other party. When a contract is silent as to the permissibility of certain conduct related to the performance of an express term of a contract, the covenant is used as a "gap-filling" tool.

86.    Section 5 of Plaintiffs' mortgage and Class members' mortgages gives Wells Fargo, substantial discretion in the selection of the insurance company and rate for force-placed insurance policies if the borrower allows their insurance to lapse. Wells Fargo is permitted by the contract to force-place insurance with the company of its choice. The "gap" that the covenant of good faith and fair dealing fills is the manner in which Wells Fargo, may go about implementing this express term. Specifically, whether Wells Fargo may permissibly set up an exclusive buying arrangement with its chosen insurer where the insurer kicks back a portion of the cost of coverage to Wells Fargo is governed by Wells Fargo's obligation of good faith and fair dealing.

87.    Wells Fargo exercised its discretion capriciously, in bad faith, and in contravention of the parties' reasonable expectations, violating the covenant of good faith and fair dealing in at least the following respects:

(a) Charging a "cost" to Plaintiffs and Class members for force-placed insurance that includes a kickback paid to Wells or its affiliates;

(b) Charging Plaintiffs and Class members for commissions when the insurance is prearranged and no commission is due;

(c) Collecting a percentage of whatever premiums are charged to Plaintiffs and the Classes

1  and not passing that percentage on to the borrower, thereby creating the incentive to seek the
2  highest-priced premiums possible;

3      (d) Failing to seek competitive bids on the open market and instead contracting to create
4  "back room" deals whereby the insurance policies are continually purchased through the same
5  companies without seeking a competitive price; and

6      (e) Increasing borrowers' flood and hazard insurance requirements to enable Wells Fargo to
7  receive kickbacks.

8      88.    Plaintiffs and the Classes have sustained damages as a result of Wells Fargo's breach
9  of contract and breach of the implied covenant of good faith and fair dealing, represented by the
10  amount of the hidden profit or financial benefit earned by Wells or its affiliate on force-placed
11  insurance procured through QBE and its subsidiaries, and excess insurance premiums Class
12  members paid for insurance in excess of their principal loan balance.

13      89.    Plaintiffs and the Class are entitled to compensation equal to the amount of their
14  damages. Plaintiffs and the Class are entitled to an injunction prohibiting Wells Fargo from
15  continuing to allow its servicing agent to charge them for kickbacks and force them to obtain
16  insurance in excess of their mortgage balances.

17                              **COUNT II**

18                           **UNJUST ENRICHMENT**

19      *AGAINST WELLS FARGO AND QBE ON BEHALF OF THE FORCE-PLACED CLASS*

20      90.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though
21  set out here word for word.

22      91.    Wells Fargo's kickback scheme is not referenced directly or indirectly in Plaintiffs'
23  mortgage and, therefore, may not be governed by Plaintiffs' mortgage.

24      92.    Plaintiffs' unjust enrichment claims against Wells Fargo arise from Wells Fargo's
25  illegal practice of earning a hidden profit or other financial benefit by collecting money from
26  residential borrowers for the exorbitant insurance premiums for force-placed flood insurance
27  policies procured through QBE and its subsidiaries where a portion of the above-market rate

1  premiums were returned to Wells and its affiliates. This secret kickback arrangement between Wells

2  Fargo and QBE monetarily benefited Wells and its affiliates at the direct expense of the Plaintiffs.

3      93.    Plaintiffs' unjust enrichment claims against QBE arise from QBE's agreement to pay

4  kickbacks to Wells Fargo in order to induce Wells Fargo to place all force-placed flood insurance

5  with QBE.

6      94.    Wells Fargo enjoyed and accepted monetary or other financial benefits from QBE

7  and its subsidiaries by accepting kickbacks paid to Wells Fargo or its affiliates out of the exorbitant

8  above-market rates being charged to the Plaintiffs under this secret kickback arrangement.

9      95.    QBE enjoyed and accepted monetary and financial benefits from Class Members by

10  accepting inflated and anti-competitive insurance premiums for force-placed insurance policies

11  purchased on behalf of Wells Fargo's borrowers.

12      96.    Wells Fargo, its affiliates, QBE, and its subsidiaries were unjustly enriched, in an

13  amount to be proven at trial, by receiving from Plaintiffs and Class members a benefit in the form of

14  overcharges for force-placed insurance policies that are excessive and unreasonable as a result of

15  Wells Fargo's kickback scheme and exclusive arrangement with QBE and its subsidiaries. It would

16  be inequitable to allow Wells, its affiliates, QBE, and its subsidiaries to retain these benefits at the

17  expense of Plaintiffs and the Force-Placed Class.

18      97.    Wells Fargo should compensate Plaintiffs and the Force-Placed Class in an amount

19  equal to all payments collected from Plaintiffs and the Force-Placed Class that represent the hidden

20  profits or other financial benefits received by Wells or its affiliate. QBE should compensate the

21  Plaintiffs and the Force-Placed Class in an amount equal to all premiums for force-placed flood

22  insurance collected from Plaintiffs and the Force-Placed Class resulting from its collusion with

23  Wells Fargo.

24      98.    Wells Fargo, its affiliates, QBE, and its subsidiaries received and are holding funds

25  belonging to Plaintiffs and the Force-Placed Class, which in equity and good conscience they should

26  not be permitted to keep.

27      99.    Plaintiffs discovered the illegal kickback arrangement that facilitated Wells Fargo's

and QBE's unjust enrichment in 2012. As discussed above, they could not have discovered this scheme prior to this date.

**COUNT III**

**CONVERSION**

*AGAINST WELLS FARGO ON BEHALF OF THE FORCE-PLACED CLASS*

100. Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

101. Wells Fargo's kickback scheme is not referenced directly or indirectly in Plaintiffs' mortgage and, therefore, may not be governed by Plaintiffs' mortgage.

102. Plaintiffs bring their conversion claims against Wells Fargo for taking a portion of Plaintiffs' force-placed flood insurance premiums.

103. Wells Fargo improperly exercises control of the property of Plaintiffs and Class members by imposing improper kickbacks and charges on Plaintiffs' and Class members' escrow accounts and collecting those kickbacks. For example, Wells Fargo required Plaintiffs to increase their mortgage payments to pay for QBE's insurance premiums and Wells Fargo's kickbacks and retained these readily identifiable funds. This exercise of control is contrary to the rights of Plaintiffs and members of the proposed Force-Placed Class.

104. The acts of Wells Fargo constitute the tort of conversion.

105. Plaintiffs and members of the proposed Force-Placed Class are entitled to the immediate possession of fees improperly collected by Wells Fargo, and are entitled to a release of all escrow charges for the improper fees.

106. Wells Fargo wrongfully converted specific and readily identifiable funds.

107. As a direct and proximate result of Wells Fargo's acts of conversion, Plaintiffs and members of the proposed Force-Placed Class have suffered and continue to suffer damages.

## COUNT IV

### BREACH OF FIDUCIARY DUTY

*AGAINST WELLS FARGO ON BEHALF OF THE FORCE-PLACED CLASS*

108.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

109.    Wells Fargo holds funds in escrow on behalf of borrowers whose mortgages it services. These funds are to be used for the purpose of paying insurance premiums when due, and any excess funds are to be returned to Plaintiffs and members of the Force-Placed Class under the terms of the mortgage agreements.

110.    Since the time that Wells Fargo acquired ownership of Plaintiffs' note and mortgage and began servicing it, Wells Fargo has managed borrowers' monies for insurance premiums on a monthly basis and held them in escrow.

111.    A fiduciary relationship exists between Plaintiffs and Wells Fargo because Wells Fargo has received a greater economic benefit than from a typical escrow transaction. *See Capital Bank v. MVB, Inc.*, 644 So. 515, 519 (Fla. 3d DCA 1994). Specifically, the debtor-creditor relationship transformed into a fiduciary relationship when Wells Fargo took it upon itself to manage borrowers' escrow accounts and withdraw money from borrowers' escrow accounts to pay force-placed flood insurance premiums. Wells Fargo began receiving unlawful kickbacks or fees under the kickback scheme it orchestrated, which is clearly a greater economic benefit than what was contemplated under the mortgage.

112.    Wells Fargo breached its fiduciary duty to Plaintiffs and other members of the Proposed Force-Placed Class by (1) not acting in their best interest when it profiting from force-placed flood insurance policies that were purchased using escrow funds it held for the benefit of Plaintiffs and Class members at the expense of Plaintiffs and Class members, and (2) not disclosing the kickback scheme to Plaintiffs and Class Members.

113.    These actions were undertaken by Wells Fargo in bad faith for its own benefit and were not intended to benefit Plaintiffs or other Proposed Class members.

114.    As a direct result of Wells Fargo's actions and subversion of Plaintiffs' interest to Defendants' own interests in reaping extravagant and outrageous fees, Plaintiffs and the Proposed Force-Placed Class have suffered injury in the form of unnecessary and excessive escrow charges and a loss of funds from their escrow accounts.

115.    Plaintiffs and the Proposed Force-Placed Class are entitled to damages for Defendants' breach of their fiduciary obligations and misappropriation of escrow funds. In addition, Plaintiffs and the Class are entitled to punitive damages because Wells Fargo, acted in bad faith in deliberate or reckless disregard of their rights and its obligation to hold their escrow funds in trust.

## COUNT V

## VIOLATIONS OF THE TRUTH IN LENDING ACT (15 U.S.C. § 1601 *et seq.*)

### *AGAINST WELLS FARGO ON BEHALF OF BOTH CLASSES*

116.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

117.    Plaintiffs' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

118.    Wells Fargo is a "creditor" as defined by the Truth in Lending Act (TILA) because it owned Plaintiffs' note and mortgage and changed the terms of that mortgage so as to create a new mortgage obligation. When Wells Fargo  added force-placed insurance charges to Plaintiffs' mortgage balance and charged them interest on these charges, it created a new loan subject to the requirements of TILA. Alternatively, Wells Fargo is the "assignee" of Plaintiffs' note and mortgage as defined 15 U.S.C. § 1641.

119.    The inaccuracy on the face of Plaintiffs' TILA disclosures are apparent on the face of the disclosures because:

(1)    the inaccuracy arose out of Wells Fargo unilaterally changing the terms of Plaintiffs' loan;

(2)     anti-coercion disclosures included with Plaintiffs' mortgage explicitly stated that the lender was prohibited from conditioning its extension of credit on the borrowers purchasing any insurance product from the lender or its affiliates;

(3)     the force-placed insurance disclosure included with Plaintiffs' mortgage specifically stated that force-placed insurance would only be obtained in the amount "required" by the lender "to protect its interest in the property[,]" and;

(4)     the Flood Hazard Notice and Hazard Insurance Authorization & Requirements contracts included with Plaintiffs' mortgage state that the borrower must purchase flood insurance at least equal to the lesser of $250,000 or the borrower's loan amount, and hazard insurance at least equal to the replacement value of improvements on the property or the loan amount, respectively.

120.    Wells was required to accurately and fully disclose the terms of the legal obligations between the parties. 12 C.F.R. § 226.17(c).

121.    Wells Fargo, violated 12 C.F.R. § 226.17(c) by (i) failing to clearly, fully, and accurately disclose its flood insurance requirements in its mortgages; and (ii) failing at all times to disclose the amount and nature of the "commission" Wells Fargo's affiliates would receive for the purchase of flood insurance.

122.    When Wells Fargo added the force-placed premium charges to the outstanding principal amount of Plaintiffs' loan, a new debt obligation was created, requiring a new set of disclosures showing the amount of the flood insurance premiums (i.e. finance charges) and all components thereof, including kickbacks. However, Wells Fargo did not provide Plaintiffs with a new set of disclosures.

123.    Plaintiffs' TILA claim is timely because Wells Fargo added force-placed insurance charges to Plaintiffs' mortgage balance in September 2011.

124.    To the extent any TILA violations are construed to relate back to the time of loan origination, Plaintiffs' and Class's claims are subject to equitable tolling as discussed *supra*.

125.    Plaintiffs and members of the Classes have been injured and have suffered a

1    monetary loss arising from Wells Fargo's violations of the TILA.

2        126.    As a result of Wells Fargo's TILA violations, Plaintiffs and members of the Classes

3    are entitled to recover actual damages and a penalty of $500,000.00 or 1% of Wells Fargo's net

4    worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

5        127.    Plaintiffs and members of the Classes are also entitled to recovery of attorneys' fees

6    and costs to be paid by Defendants, as provided by 15 U.S.C. § 1640(a)(3).

7                                    **COUNT VI**

8       **VIOLATION OF THE BUSINESS & PROFESSIONS CODE, § 17200, _et seq._**

9            _AGAINST ALL DEFENDANTS ON BEHALF OF BOTH CLASSES_

10       128.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though

11   set out here word for word.

12       129.    California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 _et seq._

13   ("UCL") prohibits any "unlawful" business act or practice.  Defendants have violated section

14   17200's prohibition against engaging in unlawful acts or practices by violationg statutes and

15   common law rules prohibiting Defendants' conduct as described herein, including::

16              a.  Breach of Contract, including breach of the implied covenant of good faith and

17                  fair dealing;

18              b.  Unjust Enrichment;

19              c.  Conversion;

20              d.  Breach of fiduciary duty;

21              e.  Violating the Truth in Lending Act, 15 U.S.C. § 1601, _et seq._; and

22              f.  Violating the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 _et seq._

23       Plaintiffs reserve the right to allege other violations of law that constitute other unlawful

24   business acts or practices.

25       130.    The UCL also prohibits any "unfair" business act or practice.  As detailed in the

26   preceding paragraphs, Defendants engaged in unfair business acts or practices by, among other

27   things, demanding and force-placing flood and hazard insurance not required by law, or in amounts

greater than required by law or necessary to secure the sums borrowed; failing to clearly, conspicuously, and adequately disclose, in standard loan and mortgage documents, the amount of flood insurance required; and engaging in other unfair business practices, such as receiving or paying kickbacks for force-placed flood and hazard insurance, to the detriment of Plaintiffs and other members of the proposed classes.

131.   These business practices are also unfair because they are contrary to the principle that (i) "lenders should avoid creating situations where a building is over-insured," 74 Fed. Reg. 35,914, 35918 (July 21, 2009); (ii) consumers should receive "meaningful disclosure of credit terms," 15 U.S.C. § 1601(a); and other clearly articulated principles of law.

132.   Defendants systematically engaged in these unfair and/or unlawful business practices to the detriment of Plaintiffs and other members of the Proposed Classes.

133.   The harm caused by these business practices vastly outweighs any legitimate business utility they possibly could have.

134.   Plaintiffs and other members of the Proposed Classes have been injured and have suffered a monetary loss as a result of Defendants' violations of the UCL.

135.   As a result of Defendants' violations of the UCL, Plaintiffs and members of the Proposed Classes are also entitled to recover attorneys' fees and costs to be paid by Defendants, as provided by Code of Civil Procedure § 1021.5 and other applicable law.

**COUNT VII**

**VIOLATIONS OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT ("RESPA"),**

**12 U.S.C. § 2601 _et seq._**

_AGAINST ALL DEFENDANTS ON BEHALF OF THE FORCE-PLACED CLASS_

136.   Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

137.   Plaintiffs' mortgage is a "federally related mortgage" as that term is defined in RESPA. More specifically, Plaintiffs mortgage is secured by a lien on their real property, which is designed principally for occupancy by one family.

138.    Defendants' purchase of force-placed insurance on Plaintiffs' and Class Members' behalf is a settlement service. When Defendants add charges for force-placed insurance to Plaintiffs' and Class Members' mortgage balances, it creates a new loan obligation. Payment of premiums for the purchase of force-placed insurance is a settlement service for this new loan obligation.

139.    Wells Fargo added force-placed premiums to Plaintiffs' mortgage balance initially when they withdrew these funds from Plaintiffs' mortgage escrow account. When Wells Fargo included this amount in their total claim for foreclosure, it once again created a new loan subject to RESPA's prohibitions on splitting fees for settlement services.

140.    12 U.S.C. § 2607 prohibits any person from accepting or giving "any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage."

141.    Wells Fargo performed no services, either on its own or through its affiliate Wells Fargo Insurance, Inc., in connection with the purchase of Plaintiffs' force-placed insurance policies. For example, they did not purchase the force-placed insurance policy, choose the provider for the force-placed insurance policy, authorize the purchase of the force-placed insurance policy, or take any other steps to facilitate the purchase of Plaintiffs' force-placed insurance policy.

142.    Wells Fargo never disclosed a written estimate of the charge or range of charges that Wells Fargo Insurance, Inc. could be paid for force-placed insurance.

143.    Wells Fargo's and QBE's actions were intentional, as demonstrated by the fact that they negotiated contracts spelling out the terms of their kickback arrangement.

144.    QBE paid and Wells Fargo or Wells Fargo Insurance accepted a split of Plaintiffs' force-placed insurance premiums. When Wells Fargo Insurance accepted kickbacks for force-placed insurance, the vast majority of these funds were returned to Wells Fargo through a system of inter-company credits and debits that profited Wells Fargo.

145.    12 U.S.C. § 2607(d) provides Plaintiffs with a private cause of action against "any person or persons who violate" RESPA's prohibitions on giving and receiving splits of fees for settlement services. QBE gave and Wells Fargo received splits of Plaintiffs' force-placed insurance

premiums, and 12 U.S.C. § 2607(d) allows Plaintiffs to recover three times the amount of the charge for the settlement service from them. This includes 100% of the charges billed to Plaintiffs' escrow account for force-placed insurance.

146.    Plaintiffs and Force-Placed Class Members are entitled to an award of costs, together with a reasonable attorney's fee.

## COUNT VIII

## EQUITABLE RELIEF

### *AGAINST ALL DEFENDANTS ON BEHALF OF BOTH CLASSSES*

147.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word and request equitable relief from the Court.

148.    Plaintiffs have no adequate remedy at law to address the wrongful conduct engaged in by Defendants. Thus Plaintiffs ask the Court to enjoin the Defendant from the practice of collecting fees for the force-placement of insurance on the grounds that the fees are neither disclosed nor permitted by Class Members' mortgage contracts. Plaintiffs further ask the Court to enjoin the Defendants from force-placing insurance in excess of their mortgage balance on the grounds that this is disallowed by their mortgage.

149.    Plaintiffs ask the Court to award restitution to return all charges Defendant or their affiliates received in connection with the purchase of force-placed insurance.

150.    Plaintiffs ask the Court to order Defendant to remove from Class Members' escrow accounts all charges that are attributable to kickbacks paid to Defendant or their affiliates for the purchased of force-placed insurance.

## DAMAGES

151.    Defendants should pay damages to Plaintiffs and the Classes in an amount to be determined at trial but, in any event, in excess of five million dollars ($5,000,000). Plaintiffs and members of the proposed Classes are entitled to punitive damages or additional damages allowed by statute for Defendants' knowing and intentional violation of laws or actions taken in wanton and reckless disregard for the harm caused to Plaintiffs and members of the proposed Classes.

**DEMAND FOR JURY TRIAL**

152.    Plaintiffs, on behalf of themselves and all others similarly situated, demand a trial by jury of all matters so triable.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and other members of the Classes, demand judgment against Wells Fargo and QBE as follows:

(1)    Declaring this action to be a proper class action maintainable pursuant to   Rule 23(a) and Rule 23(b) of the Federal Rules of Civil Procedure and declaring Plaintiffs to be the representatives of the Classes;

(2)    Awarding damages sustained by Plaintiffs and the Classes as a result of Wells Fargo's breach of contract, including the implied covenant of good faith and fair dealing, together with prejudgment interest;

(3)    Finding that Wells Fargo and QBE have been unjustly enriched, and requiring Wells Fargo and QBE to refund all unjust benefits to Plaintiffs and the Force-Placed Class, together with prejudgment interest;

(4)    Finding that Wells committed the tort of conversion by withdrawing and retaining borrowers' funds from borrowers' escrow accounts to pay for insurance premiums that included wrongful charges for kickbacks paid to Wells or its affiliates, and requiring Plaintiffs and members of the Force-Placed Class to replenish their escrow accounts after the withdrawal of these wrongful charges;

(5)    Finding that Defendants violated the Real Estate Settlement Procedures Act and the California Unfair Business Practices Act;

(6)    Finding that Wells Fargo violated the Truth in Lending Act;

(7)    Awarding Plaintiffs and members of the proposed Classes the maximum amount of damages allowable under applicable law along with pre-judgment interest as allowed by applicable law;

(8)     Granting all relief described above;

(9)     Granting a trial by jury of all issues so triable;

(10)    Awarding Plaintiffs and the Classes costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Classes' counsel and experts, and reimbursement of expenses; and

(11)    Such other and further relief as the Court deems just and equitable.

Dated: July 31, 2012

                                        Respectfully submitted,


                                        Sheri L. Kelly, SBN 226993
                                        E-mail: slk@sherikellylaw.com
                                        LAW OFFICE OF SHERI L. KELLY
                                        31 E. Julian St.
                                        San Jose, CA  95112
                                        Telephone: 408/287-7712
                                        Facsimile: 408/583-4249

                                        T. Brent Walker, *pro hac vice application pending*
                                        Russell D. Carter III, *pro hac vice application pending*
                                        CARTER WALKER PLLC
                                        2171 West Main, Suite 200
                                        P.O. Box 628
                                        Cabot, AR 72023
                                        Telephone: 501/605-1346
                                        Facsimile: 501/605-1348
                                        bwalker@carterwalkerlaw.com
                                        dcarter@carterwalkerlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Steven A. Owings, *pro hac vice application pending*
Alexander P. Owings, *pro hac vice application pending*
OWINGS LAW FIRM
1400 Brookwood Drive
Little Rock, AR 72202
Telephone: 501/661-9999
Facsimile: 501/661-8393
sowings@owingslawfirm.com
apowings@owingslawfirm.com

Jack Wagoner, *pro hac vice application pending*
WAGONER LAW FIRM, P.A.
1320 Brookwood, Suite E
Little Rock, AR 72202
Telephone: 501/663-5225
Facsimile: 501/660-4030
Jack@wagonerlawfirm.com

**Counsel for Plaintiffs**

# EXHIBIT A

After Recording Return To:

FREEDOM FINANCIAL SERVICES OF ARKANSAS,
INC.
301 N. SHACKLEFORD ROAD, SUITE C-1
LITTLE ROCK, ARKANSAS 72211
Loan Number 5551470

This Instrument Prepared By:

Absolute Abstract & Title, Inc.
301 N. Shackleford Road
Suite E-2
Little Rock, Arkansas 72211

FILED
SALINE CIRCUIT &
CHANCERY CLERK

'01 MAY  7  AM 10 33

BY _____

Recorded in the Above
Deeds and Mortgages Book & Page
07-07-2006 0┃:21:45 PM
Tommy Sue Keffe┃-Circuit Clerk
Arkansas County  AR Northern Dist

[Space Above This Line For Recording Data]

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

(A) "Security Instrument" means this document, which is dated APRIL  25          , 2001 ,
together with all Riders to this document.
(B) "Borrower" is DANNY LANE, A MARRIED MAN AND BEVERLY LANE, A
MARRIED WOMAN HUSBAND AND WIFE AS JOINT TENANTS WITH RIGHT OF
SURVIVORSHIP

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is FREEDOM FINANCIAL SERVICES OF ARKANSAS, INC.

Lender is a CORPORATION
and existing under the laws of ARKANSAS                                    organized
Lender's address is 301 N. SHACKLEFORD ROAD, SUITE C-1, LITTLE ROCK,
ARKANSAS 72211
Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated APRIL  25      , 2001 .
The Note states that Borrower owes Lender FORTY ONE THOUSAND ONE HUNDRED FIFTY
AND 00/100                          Dollars (U.S. $ 41,150.00          ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
MAY  1          , 2021 .
(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider      ☐ Condominium Rider           ☐ Second Home Rider
☐ Balloon Rider              ☐ Planned Unit Development Rider   ☐ Other(s) [specify]
☐ 1-4 Family Rider           ☐ Biweekly Payment Rider

01 2734

ARKANSAS–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Document Systems, Inc. (800) 649-1362                      Page 1 of 12                      Form 3004 1/01

AR3004I.MTG

Arkansas Coun┃  AR Northern Dist
I certify thi┃ nstrument was filed on
07-07-2006 01┃:45 PM
and recorded ┃ Deeds and Mortgages Book
2006 at pages┃53 - 6365
Tommy Sue Kef┃-Circuit Clerk

2006 6354
Recorded in the Above
Deeds and Mortgages Book & Page
07-07-2006 01:21:45 PM

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. $2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably mortgages, grants and conveys to Lender, the following described property located in the

| COUNTY | of | ARKANSAS | |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".

01 21345

which currently has the address of 138 SWL ROAD

| | | | [Street] |
| HUMPHREY | , Arkansas | 72073 | ("Property Address"): |
| [City] | | [Zip Code] | |

ARKANSAS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Document Systems, Inc. (800) 649-1362          Page 2 of 12

Form 3004 1/01

ARX004.MTG

TOGETHER  WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER  COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT  combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS.  Borrower and Lender covenant and agree as follows:
1.    Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note.  Borrower shall also pay funds for Escrow Items pursuant to Section 3.  Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15.  Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current.  Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds.  Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current.  If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower.  If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure.  No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.
2.    Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge.  If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full.  To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.  Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

ARKANSAS–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                               Form 3004 1/01
Document Systems, Inc. (800) 649-1362                               Page 3 of 12

ARX004.MTG

2006 8556
Recorded in the Above
Deeds and Mortgages  Book & Page
07-07-2006 01:21:45 PM

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent

---

2006 6357
Recorded in the Above
Deeds and Mortgages  Book & Page
07-07-2006 01:21:45 PM

the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.    Property Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

ARKANSAS--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Document Systems, Inc. (800) 649-1362                    Page 5 of 12                           Form 3004 1/01

ARKDMS.MTG

2006 6658
Recorded in the Above
Deeds and Mortgages  Book & Page
07-07-2006 01:21:45 PM

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   **Occupancy.**   Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   **Preservation, Maintenance and Protection of the Property; Inspections.**   Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   **Borrower's Loan Application.**   Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**   If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

2006   8359
Recorded in the Above
Deeds and Mortgages  Book & Page
07-07-2006 01:21:45 PM

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.   **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a)   Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b)   Any such agreements will not affect the rights Borrower has – if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.   **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until

01 27350

ARKANSAS–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Document Systems, Inc. (800) 649-1362                    Page 7 of 12                                    Form 3004 1/01

ARX047.MTG

Recorded in the Above
Deeds and Mortgages  Book & Page
07-07-2006 01:21:45 PM

Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12.   Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13.   Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs

01 27151

ARK0048.MTG

2006 8361
Recorded in the Above
Deeds and Mortgages Book & Page
07-07-2006 01:21:45 PM

this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

01 27352

AR3004.MTG

2006   6362
Recorded in the Above
Deeds and Mortgages  Book & Page
07-07-2006 01:21:45 PM

18.    **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19.    **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20.    **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

Recorded in the Above
Deeds and Mortgages  Book & Page
07-07-2006  01:21:45 PM

21.  **Hazardous Substances.**  As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22.  **Acceleration; Remedies.**  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

It is understood and agreed to by Borrower that this Security Instrument is subject to the foreclosure procedures of the Arkansas Statutory Foreclosure Law, Act 53 of 1987, as amended from time to time (the "Act"), for Borrower's breach of any covenant or agreement in this Security Instrument. In furtherance and not in limitation of the provisions of Section 12, any forbearance by Lender in exercising any right or remedy under the Act shall not be a waiver of or preclude acceleration and the exercise of any right or remedy under the Act, or at the option of Lender, use of judicial foreclosure proceedings.

23.  **Release.**  Upon payment in full of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24.  **Waivers.**  Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

2006   8364
Recorded in the Above
Deeds and Mortgages  Book & Page
07-07-2006 01:21:45 PM

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
DANNY LANE                          -Borrower

_____ (Seal)
BEVERLY LANE                         -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

Witness:                            Witness:

_____             _____


State of Arkansas
County of ~~PULASKI~~ Lonoke

On this the  25  day of April, 2001
before me, Gerrie Flowers
the undersigned officer, personally appeared  DANNY LANE, BEVERLY LANE

known to me (or satisfactorily proven) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposes therein contained.
   In witness whereof I hereunto set my hand and official seal.

GERRIE FLOWERS
Lonoke County
Notary Public - Arkansas
My Commission Expires Mar 1, 2009

_____
Notary Public

         (Seal)

My commission expires:  3/1/09

ARKANSAS–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Document Systems, Inc. (800) 649-1362
Page 12 of 12

Form 3004 1/01

27355

01

AR3004I2.MTG

Recorded in the Above
Deeds and Mortgages Book & Page
07-07-2006 01:21:45 PM
Tommy Sue Keffer-Circuit Clerk
Arkansas County AR Northern Dist

**EXHIBIT A**

File Number: 2001-0807

A TRACT OF LAND LYING IN THE FRACTIONAL SOUTH HALF OF THE NORTHEAST QUARTER (RIGHT AND SOUTH OF BAYOU) IN SECTION 10, TOWNSHIP 4 SOUTH, RANGE 6 WEST, MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGIN AT A POINT ON THE SOUTH LINE OF THE NORTHEAST QUARTER OF SECTION 10 AFORESAID LOCATED 14.5 CHAINS EAST OF THE SOUTHWEST CORNER OF THE NORTHEAST QUARTER OF SAID SECTION; RUN THENCE EAST ON SAID SOUTH LINE OF SAID NORTHEAST QUARTER A DISTANCE OF 1.4 CHAINS TO A CORNER; RUN THENCE APPROXIMATELY 8 CHAINS TO THE CENTER OF THE MAIN CHANNEL OF BAYOU METO; RUN THENCE WESTERLY ALONG THE CENTER OF THE MAIN CHANNEL OF BAYOU METO A DISTANCE OF APPROXIMATELY 1.4 CHAINS TO A POINT LOCATED DIRECTLY NORTH OF THE POINT OF BEGINNING (BEING THE NORTHEAST CORNER OF A TRACT OF LAND THIS DAY CONVEYED BY THE GRANTORS TO NORRIS AND LUCILLE SWAN); RUN THENCE SOUTH, A DISTANCE OF APPROXIMATELY 7.2 CHAINS TO THE POINT OF BEGINNING; SAID LANDS CONTAINING APPROXIMATELY 1 ACRE.

PARCEL #001-02702-001



FILED FOR RECORD 27344
In DOC Book 01 Page
MAY 07 2001
at 10:33 o'clock A M
DOUG KIDD, CIRCUIT CLERK
BY _____ DC

01 27356

Book 01 Page 27344
A TRUE COPY CERTIFIED THIS

JUL 06 2006

DOUG KIDD, CIRCUIT CLERK
SALINE COUNTY, ARKANSAS
BY _____ DC