1
2
3
4
5
6             IN THE UNITED STATES DISTRICT COURT
7
8             FOR THE NORTHERN DISTRICT OF CALIFORNIA
9

**United States District Court**
For the Northern District of California

10   Danny LANE and Beverly LANE,              No. C 12-04026 WHA
     individually and for all other persons
11   similarly situated,

12            Plaintiffs,                       **ORDER GRANTING IN PART AND
                                               DENYING IN PART WELLS
13     v.                                      FARGO'S MOTION TO DISMISS**

14   WELLS FARGO BANK N.A. and QBE
     AMERICAS, INC.,
15
16            Defendants.
17   _____/

18                        **INTRODUCTION**

19        In this putative class action involving flood and hazard insurance on home mortgages,

20   defendant moves to dismiss all claims.  For the reasons stated below, defendant's motion is

21   **GRANTED IN PART** and **DENIED IN PART**.

22                         **STATEMENT**

23        Plaintiffs Danny and Beverly Lane are residents of Arkansas who obtained a loan in 2001

24   from Freedom Financial Services of Arkansas, Inc.  To secure the loan, plaintiffs executed a

25   "Fannie Mae/Freddie Mac form mortgage" on a residential property in Arkansas (Compl. ¶ 26).

26   The principal balance of their mortgage at closing was $41,150.  The note and mortgage were

27   later purchased by defendant Wells Fargo Bank, N.A. (*id*. at ¶ 24).  Wells Fargo also serviced

28   plaintiffs' loan, beginning in April 2001 (*id*. at ¶ 30).

United States District Court

For the Northern District of California

1    Plaintiffs' property was located in a special flood hazard area.  Consequently, when they

2 entered into their mortgage, plaintiffs signed "Flood Zone Notification" and "Hazard Insurance

3 Authorization and Requirements" forms that required plaintiffs to maintain flood insurance

4 (Compl. ¶¶ 28–29).

5    The practice of purchasing insurance by the lender when a borrower does not obtain

6 insurance coverage in the amount the lender requires is known as "force-placement" of insurance

7 (*id.* at ¶ 2).  Plaintiffs allege that force-placing insurance in excess of their outstanding principal

8 balance was not authorized by their mortgage (*id.* at ¶ 7).  Over time, Wells Fargo required

9 increasing amounts of flood and hazard insurance for plaintiffs' property.  On September 9,

10 2011, Wells Fargo purchased $52,000 of flood insurance and $52,000 of hazard insurance

11 policies for plaintiffs' property.  Rather than merely "exercise[] its right to purchase insurance

12 for the borrower," Wells Fargo procured insurance in excess of plaintiffs' mortgage balance,

13 which was approximately $28,000 on that date.  In fact, the insurance policies were higher even

14 than plaintiffs' original principal balance at the time of closing (*id.* at ¶ 34).

15    Not only was the amount of insurance required in excess of the mortgage loan, but Wells

16 Fargo also did not purchase the insurance through good-faith, arms-length transactions.  Instead,

17 Wells Fargo entered into arrangements with QBE Americas, Inc., to purchase insurance

18 exclusively from QBE.[1]  Wells Fargo then charged borrowers "exorbitant rates" reflecting the

19 full cost of the insurance premium.  Plaintiffs allege that "a substantial portion of the premiums

20 [were] refunded to Wells Fargo through kickbacks or unwarranted 'commissions'" (*id.* at ¶¶

21 39–40).  The premiums on the insurance policies Wells Fargo procured "generally cost at least

22 five to six times, and often up to ten times, more than what the borrower was either originally

23 paying or what the borrower could obtain if he or she purchased the insurance on a competitive

24 basis on the open market" (*id.* at ¶ 41).  Wells Fargo maximized the kickbacks it received by

25 force-placing insurance policies in excess of the amounts agreed upon in the mortgage

26

27

28    [1] Named defendant QBE Americas, Inc. was voluntarily dismissed pursuant to Rule 41(a)(1)(A) (Dkt. No. 50).

1   agreement.  Additionally, Wells Fargo applied insurance policies retroactively to cover periods

2   of time where coverage had lapsed but there had been no insurance claims (*id.* at ¶ 52).

3          The complaint alleges claims for (1) breach of contract, including the implied covenant

4   of good faith and fair dealing, (2) unjust enrichment, (3) conversion, (4) breach of fiduciary duty,

5   (5) violations of the Truth in Lending Act, (6) violation of California Business and Professions

6   Code Section 17200, and (7) violations of RESPA.  Plaintiffs seek equitable relief (including

7   restitution) and damages, as well as attorney's fees.

8          Plaintiffs purport to represent two nationwide classes, including at least one subclass of

9   California class members.  The first putative class, the "force-placed class," would include all

10  persons in the United States with a loan serviced by Wells Fargo who were charged for a force-

11  placed flood or hazard insurance policy procured through Wells Fargo and QBE during the

12  relevant time period, with a subclass of California residents.  The second putative class, the

13  "excess insurance class," would include all borrowers whom Wells Fargo required to maintain

14  flood or hazard insurance coverage in excess of the borrower's total outstanding loan balance

15  (regardless of whether the insurance was purchased by the borrower or was force-placed by

16  Wells Fargo).  Wells Fargo moves to dismiss all claims.  For the reasons stated below, the

17  motion to dismiss is **GRANTED IN PART AND DENIED IN PART**.

18                  **CONSIDERATION OF DOCUMENTS OUTSIDE THE COMPLAINT**

19         Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject

20  to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to

21  sources whose accuracy cannot reasonably be questioned."  Under the incorporation by reference

22  doctrine, a document not appended to a complaint "may be incorporated by reference into a

23  complaint if the plaintiff refers extensively to the document or the document forms the basis of

24  the plaintiff's claim."  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  Wells Fargo

25  requests judicial notice of 61 documents.

26         As this order does not rely on the document, the request for judicial notice of exhibit 1

27  (an unpublished decision from a federal magistrate judge in Alabama) is **DENIED AS MOOT**.

28  Plaintiffs object to exhibits two through six, purportedly documents published on the websites of

3

federal agencies including the OCC, FDIC, and FEMA, on the grounds that (1) the documents do not appear to be publicly available, (2) are not self-authenticating documents, and (3) Wells Fargo has not provided evidence to establish the authenticity of the documents as government reports.  Plaintiffs do not offer any specific objection to the documents and do not dispute that the exhibits themselves are accurate copies of the information available on the agency websites, as identified by Wells Fargo.  Plaintiffs' objections to exhibits two through six are **OVERRULED**. Judicial notice of these documents is appropriate, as they are publications that are currently available on the federal agencies' websites and are therefore "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Plaintiffs do not object to exhibits 7 and 8, which are documents included with plaintiffs' mortgage loan and signed by plaintiff Danny Lane.  The documents are referenced in the complaint, and therefore may be properly considered on a motion to dismiss.  Judicial notice of exhibits two through eight is therefore **GRANTED**.

Wells Fargo requests judicial notice be taken of exhibits nine through eighteen under the incorporation-by-reference doctrine.  The exhibits are purportedly letters that Wells Fargo sent to plaintiffs in its capacity as loan servicer.  Wells Fargo further requests judicial notice be taken of exhibits 19 through 61, purportedly letters HomEq Servicing sent to plaintiffs as loan servicer before Wells Fargo became the servicer in 2010.[2]  Wells Fargo contends that the documents are referenced in the complaint as "form letters to borrowers regarding force-placed insurance" (Compl. ¶ 61).  Plaintiffs dispute the authenticity of the documents.  Though the letters are addressed to plaintiffs and printed on HomEq or Wells Fargo letterhead, they are not signed by plaintiffs and there is nothing to establish they were sent to or received by plaintiffs.  The request for judicial notice of these documents is therefore **DENIED**.

---

[2]  Wells Fargo contends that prior to 2010, HomEq Servicing was plaintiffs' loan servicer.  The complaint alleges that Wells Fargo had been the servicer since 2001 (Compl. ¶ 30).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

**ANALYSIS**

**1.   LEGAL STANDARD.**

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  "All allegations of material fact are taken as true and construed in the light most favorable to plaintiff.  However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim."  *Epstein v. Wash. Energy Co*., 83 F.3d 1136, 1140 (9th Cir.1996) (citations omitted).

The parties' primary dispute is whether Wells Fargo was authorized to purchase flood insurance for plaintiffs in connection with their mortgage loan in excess of the minimum required under the National Flood Insurance Act.  Secondly, at issue is whether Wells Fargo improperly charged plaintiffs for fees and costs that Wells Fargo, through its affiliate Wells Fargo Insurance, Inc., received as commissions.  Lastly, plaintiffs contend that Wells Fargo improperly back-dated insurance policies and charged borrowers for the unnecessary insurance.

**2.   APPLICABLE LAW.**

The parties agree that the forum state's choice-of-law rules — here, California — apply to plaintiffs' state law claims.  *See Douglas v. U.S. Dist. Court for C.D. Cal.*, 495 F.3d 1062, 1067 (9th Cir. 2007) (citing *Paracor Fin., Inc. v. Gen. Elec. Capital Corp*., 96 F.3d 1151, 1164 (9th Cir. 1996)).  Plaintiffs do not dispute that Arkansas law should apply to their claims for breach of contract or the implied covenant of good faith and fair dealing, as the mortgage agreement contained a choice-of-law provision stating that the agreement "shall be governed by federal law and the law of the jurisdiction in which the property is located" (Compl. Exh. A. ¶ 16).  Plaintiffs contend, however, that California law should be applied to their tort claims for unjust enrichment, conversion, and breach of fiduciary duty.  Plaintiffs further contend that California law, including California Business and Professions Code Section 17200, may

1    constitutionally be applied because Wells Fargo "maintains its principal place of business in

2    California and a substantial part of the acts or omissions giving rise to their claims occurred in

3    California" (Opp. 22).

4        *First,* there are no current plaintiffs who have standing to assert a Section 17200 claim, as

5    the two plaintiffs are from Arkansas and have not otherwise demonstrated, apart from the above

6    conclusory allegation, that application of Section 17200 outside California would be appropriate.

7    There is no current representative who himself or herself could assert such a claim under

8    California law.  *See In re Charles Schwab Corp. Sec. Litig.*, 264 F.R.D. 531, 537–38 (N.D. Cal.

9    2009); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1026–27,

10   1029–30 (N.D. Cal. 2007).

11       *Second*, plaintiffs assert, and Wells Fargo does not contest, that the laws of California

12   and Arizona are "nearly identical" as regards plaintiffs' claims for unjust enrichment,

13   conversion, and breach of fiduciary duty.  To advance this litigation, this order determines that

14   Arkansas law applies to both plaintiffs' contract and tort claims, based on the choice-of-law

15   principles set forth in *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459 (1992).  In *Nedlloyd*,

16   the California Supreme Court held that "a valid choice-of-law clause, which provides that a

17   specified body of law 'governs' the 'agreement' between the parties, encompasses all causes of

18   action arising from or related to that agreement, regardless of how they are characterized,

19   including tortious breaches of duties emanating from the agreement or the legal relationships it

20   creates."  *Id.* at 470.[3]

21       Plaintiffs' contract and tort claims are based on Wells Fargo's alleged improper practices

22   in procuring and charging for unauthorized insurance and obtaining hidden profits — all claims

23   that arise from the loan agreement and relationship created thereby.  For example, to the extent

24   that a breach of fiduciary duty can be alleged, it must arise from a special relationship

25   _____

26       [3]  The California Supreme Court noted that the question of interpreting the contract agreement, including the choice-of-law clause itself, should generally be determined by the contract's chosen law.  Because the parties neither requested judicial notice of that forum's law, nor provided evidence of the relevant aspects of

27   that law, California law was applied.  *Id.* at 469 fn. 7.  Here, the parties likewise both argue that California law applies to determining the scope and applicability of the contract's choice-of-law provision, and have presented

28   no evidence or argument regarding how applying Arkansas choice-of-law principles would affect the analysis herein.

established by the loan agreement.  Similarly, whether Wells Fargo converted funds in plaintiffs'

escrow account by collecting kickbacks and unauthorized charges depends on whether plaintiffs

authorized the bank to do so, a question that is related to and arises from the parties' agreement.

*See also Hatfield v. Halifax PLC*, 564 F.3d 1177, 1183-84 (9th Cir. 2009).

Under the *Nedlloyd* test, the choice-of-law provision is enforceable because Arkansas has

a substantial relationship to the parties or their transaction, as the property is located in Arkansas,

plaintiffs are residents of Arkansas, and the mortgage was initially obtained from an Arkansas

company (Compl. Exh. A).  Next, a court must determine whether Arkansas law is "contrary to a

*fundamental* policy of California."  *Nedlloyd*, 3 Cal. 4th at 466 (emphasis in original).  Because

the parties do not dispute the similarity of the state laws in question, and plaintiffs do not

contend that California law would preclude freedom of contract in this context, the choice-of-law

provision is enforceable.  This order now turns to plaintiffs' state law claims, applying the

parties' chosen law of Arkansas.

### 3.    THE NATIONAL FLOOD INSURANCE ACT OF 1968.

Congress enacted the NFIA in 1968 "in response to a growing concern that the private

insurance industry was unable to offer reasonably priced flood insurance on a national basis."

*Flick v. Liberty Mut. Fire Ins. Co.*, 205 F.3d 386, 387 (9th Cir. 2000).  The NFIA authorized the

establishment of the National Flood Insurance Program to provide affordable flood insurance.

*See* 42 U.S.C. 4001(b); 4011(a).

Soon thereafter, Congress passed the Flood Disaster Protection Act of 1973, which

required property owners to obtain flood insurance coverage on property located in federally

designated special flood hazard areas in order to qualify for certain assistance or financing.  *See*

42 U.S.C. 4012a; *Hofstetter v. Chase Home Fin., LLC*, No. 10-1313, 2010 WL 3259773, at *4

(N.D. Cal. Aug. 16, 2010).  Federally regulated private lenders were prohibited from making a

loan secured by property located in a designated special flood hazard area unless flood insurance

was obtained.  42 U.S.C. 4012a(b)(1).

Congress later enacted the National Flood Insurance Reform Act of 1994, which

imposed further obligations regarding mandatory flood insurance requirements.  The Act

United States District Court

For the Northern District of California

authorized federally regulated mortgage lenders and servicers to purchase flood insurance for property in special flood hazard areas when borrowers with loans secured by such property failed to purchase the minimum amount of flood insurance required under 42 U.S.C. 4012a(b).  Prior to purchasing such insurance, the borrower was required to be given proper notice and an opportunity to purchase insurance for him or herself.  42 U.S.C. 4012a(e).  The amount of insurance required was "at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act with respect to the particular type of property, *whichever is less*."  42 U.S.C. 4012a(b) (emphasis added).  At the time Wells Fargo purchased flood insurance for plaintiffs, the maximum coverage made available under the Act for a single-family dwelling was, and remains, $250,000.  42 U.S.C. 4013(b)(2).

Plaintiffs agree that Wells Fargo was authorized to purchase flood insurance for their property after plaintiffs themselves failed to do so.  They contend, however, that the maximum amount of insurance Wells Fargo could purchase was limited to the amount of plaintiffs' outstanding principal balance.  This order disagrees.  Under the mortgage agreement, Wells Fargo had discretion to purchase flood insurance in an amount greater than the minimum required under the NFIA.  As explained below, however, plaintiffs have adequately alleged that Wells Fargo improperly charged for fees and costs that it obtained through its affiliate by purchasing insurance via exclusive agreements.

**4.      BREACH OF CONTRACT AND IMPLIED COVENANT CLAIMS.**

Under Arkansas law, a breach of contract requires "the existence of an agreement, breach of the agreement, and resulting damages."  *Ultracuts Ltd. v. Wal-Mart Stores, Inc.*, 343 Ark. 224, 231–32, 33 S,W,3d 128, 133 (Ark. 2000).  Arkansas law requires courts to "look to the contract as a whole and the circumstances surrounding its execution to determine the intention of the parties."  *First Nat'l Bank of Crossett v. Griffin*, 310 Ark. 164, 170, 832 S.W.2d 816, 820 (Ark. 1992).  "[D]ifferent clauses of a contract must be read together and the contract construed so that all of its parts harmonize, if that is at all possible."  *Id.* at 819 (quoting *Cont'l Casualty Co. v. Davidson*, 250 Ark. 35, 463 S.W.2d 652 (Ark. 1971)).

**United States District Court**
For the Northern District of California

### A. Whether Wells Fargo Was Authorized to Purchase Insurance Above the Minimum Required by Federal Law.

The mortgage agreement provided broad discretion to the lender to set the amount of insurance required.  The mortgage agreement stated:

> Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire . . . and any other hazards including, but not limited to, earthquakes and floods, for which the Lender requires insurance. *This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.* . . .
> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard, or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.

(Compl. Exh. A ¶ 5) (emphasis added).  Plaintiffs contend that the contract is ambiguous because several other federal judges have so determined, citing as an example the United States Court of Appeals for the First Circuit's decision in *Lass v. Bank of America, N.A.*, 695 F.3d 129, 143 (1st Cir. 2012).  In *Lass*, the court of appeals interpreted a similar contract provision and noted that if the provision quoted above "constituted the entire agreement on flood insurance, the Bank would have a compelling argument that the mortgage could only reasonably be interpreted to give it discretion to increase the insurance obligation during the life of the loan." *Id.* at 135.  The court of appeals then considered the flood zone notification form provided to and signed by the plaintiffs on the same day as the mortgage agreement.  The notification form stated:

> [A]t the closing the property you are financing must be covered by flood insurance in the amount of the principle [sic] amount financed, or the maximum amount available, whichever is less.  This insurance will be mandatory until the loan is paid in full.

*Id.* at 132.  The court of appeals first determined that the mortgage agreement gave the lender the discretion to fix the amount of flood insurance.  Next, reading the two documents together, the court of appeals found that the notification form "represented the exercise of [the lender's] discretion" at the outset of the mortgage period.  "In effect, the Notification completed the

9

contract between the parties by specifying that, by the time of the closing, [plaintiff] was obliged to obtain the amount of flood insurance required by federal law, and no more." *Id.* at 135. Significantly, the court of appeals noted that the notification form did not identify the specified amount "as merely a mandatory minimum." The court of appeals found that the two documents, read as a whole, were ambiguous regarding whether the insurance was limited to the amounts identified in the notification form or could be set and changed at the bank's discretion, as set forth in the mortgage agreement.

Here, plaintiffs signed the both mortgage agreement and flood zone notification form on April 25, 2001. Plaintiffs urge that the two documents must be considered together. Under Arkansas law, multiple documents executed as part of a single transaction generally will be construed together as a single contract. *Smith v. Arrington Oil & Gas, Inc*., 664 F.3d 1208, 1213 (8th Cir. 2012) (citing *W.T. Rawleigh Co. v. Wilkes*, 197 Ark. 6, 121 S.W.2d 886 (Ark. 1938)). The flood zone notification form included a summary of the NFIP insurance requirement and informed the borrower that the lender requested a flood zone determination to determine whether the property was located in a designated flood hazard area. It further stated:

> *At a minimum*, flood insurance purchased must cover the lesser of:
> (1) the outstanding principal balance of the loan; or (2) the
> maximum amount of coverage allowed for the type of property
> under the NFIP. Flood insurance coverage under the NFIP is limited
> to the overall value of the property securing the loan minus the value
> of the land on which the property is located.

(RJN Exh. 7) (emphasis added). The notification was signed by plaintiff Danny Lane under the line "I/We have read and understand the contents of this notice, as evidenced by my/our signature(s) below."

Construing the flood zone notification and mortgage agreement together, this order finds that nothing in the flood zone notification indicated that the parties thereby agreed to limit the lender's discretion by pegging it solely to the NFIP's minimum requirements. On the facts of this case, this order respectfully declines to follow the majority's opinion in *Lass*. *First*, the form in this case is different than that considered in *Lass*. The notification form signed by plaintiffs herein clearly stated that the amounts identified were merely the minimum requirements under federal law. *Second*, and as noted by Judge Boudin, writing in dissent, the

United States District Court

For the Northern District of California

mortgage agreement explicitly provided that flood insurance "'shall be maintained in the amounts and for the periods that Lender requires,' indicating that the lender can require a different amount in a later period." *Lass*, 695 F.3d at 143 (Boudin, J., dissenting).  Judge Boudin stated that:

> The separate Flood Insurance Notification, establishing specific minimums (because the government so requires), does not purport to qualify this unequivocal obligation to maintain any hazard insurance in the amounts and for the periods the lender requires.  Nor does the Flood Insurance Notification in any way conflict with or contradict this obligation:  it merely establishes a government required minimum for flood insurance regardless of whether the lender requires insurance in a lesser amount or in no amount at all.

> Nor does the provision allowing the bank to purchase insurance "to protect Lender's rights in the Property" require that the insurance be limited to the unpaid balance. By virtue of its provision of the loan and the risks of nonpayment, the lender has an interest both in the loan amount and in the stream of interest payments; both give it ample reason to insist on insurance that goes beyond the unpaid balance of the loan and up to the replacement cost.

*Ibid*.  This order finds this reasoning persuasive, particularly given that the notification form in this case specifically stated that the identified amounts were minimum, not mandatory, requirements.

    Moreover, to interpret the notification form as canceling out a clear provision elsewhere in the contract would be contrary to the principles of contract interpretation applied by Arkansas law.  "A construction that neutralizes any provision of a contract should never be adopted if the contract can be construed to give effect to all provisions."  *Tyson Foods, Inc. v. Archer*, 356 Ark. 136, 144, 147 S.W.3d 681, 868 (Ark. 2004).  Reading the documents together, the flood notification form provided the minimum amount set by federal law, which both the borrower and lender would be required to follow.  No maximum amount was set.  Rather, the mortgage agreement provided that the lender had discretion to determine the appropriate amount of flood insurance.  This order agrees with Magistrate Judge Joseph Spero's reasoning in *McKenzie v. Wells Fargo Home Mortgage, Inc.*, wherein Judge Spero determined that similar contract language was unambiguous: "[t]he only reasonable interpretation of the contract is that it gives the borrower the ability to purchase, *and* the lender the ability to require, flood insurance above

**United States District Court**
For the Northern District of California

1   the minimum amount." *McKenzie v. Wells Fargo Home Mortg., Inc.,* No. 11-4965, 2012 WL

2   5372120, at *18 (N.D. Cal. Oct. 30, 2012).

3          This does not mean, however, that the lender's discretion to set the insurance amount is

4   unlimited.   As counsel for Wells Fargo acknowledged at the hearing, the lender must exercise its

5   discretion reasonably.   The mortgage agreement stated that the lender is authorized to "do and

6   pay for whatever is *reasonable or appropriate* to protect Lender's interest in the Property and

7   rights under this Security interest" (Compl. Exh. A ¶ 9) (emphasis added).   Additionally, under

8   Arkansas law, "every contract imposes upon each party a duty of good faith and fair dealing in

9   its performance and in its enforcement." *Cantrell-Waind & Assocs., Inc. v. Guillaume*

10  *Motorsports, Inc*., 62 Ark. App. 66, 72, 968 S.W.2d 72, 75 (Ark. Ct. App. 1998) (quoting

11  Restatement (Second) of Contracts § 205 (1981)).   Here, plaintiffs have not pled facts that would

12  establish that Wells Fargo exercised its discretion unreasonably and arbitrarily in requiring, and

13  eventually purchasing, the $58,000 insurance policies.   While this amount was above the

14  principal of plaintiffs' loan, it was presumably set at or near the replacement cost value of the

15  property (*see* RJN Ex. 7 at 2).   The complaint has not alleged otherwise.   Wells Fargo argues that

16  its interest in plaintiffs' property was not necessarily limited to the outstanding principal of their

17  loan.   The bank also makes money off the interest rates paid by a borrower on a performing loan,

18  and thus has an interest in insuring a property up to the replacement cost value.   Given the

19  transaction costs involved in originating loans, the bank has a reasonable interest in maintaining

20  performing loans.

21          Plaintiffs' breach-of-contract claim is based on their contention that defendant was

22  afforded no discretion to require insurance in an amount above the minimum required by the

23  NFIA.   Careful review of the parties' agreement does not support this view.   This order finds that

24  Wells Fargo did not breach its contract with plaintiffs simply by requiring flood insurance above

25  the minimum amount required by federal law.   Plaintiffs have not alleged that the $58,000 of

26  insurance required and purchased by Wells Fargo for their property was over and above the

27  replacement cost value.

28

As to the claim for excessive hazard insurance, plaintiffs fare no better.  Plaintiff Danny Lane signed a Hazard Insurance Authorization & Requirements form, dated April 25, 2001.  The hazard insurance form states:

> Listed below are Lender's policies and procedures, and minimum requirements, for the Hazard Insurance which must be provided covering the subject property.
>     1. Coverage must be in an amount at least equal to the replacement value of improvements on the property or the loan amount.

(RJN Exh. 7 at 2).  Reading this document together with the mortgage agreement, the form notice indicated that the lender could set insurance at either the replacement cost value or the loan amount.  While it indicated a minimum required amount, it did not displace or contradict the mortgage agreement, which provided that the lender had discretion to set the amount of insurance required, within reason.

**B.    Whether Plaintiffs' Allegations Regarding Kickbacks and Backdating Are Sufficient to State a Claim.**

Plaintiffs have also alleged that Wells Fargo overcharged them for the flood and hazard insurance procured for plaintiffs' property by charging for kickbacks and backdating insurance policies.  Although authorized to purchase insurance, Wells Fargo allegedly imposed fake or exorbitant charges for commissions, which it received through its affiliate, Wells Fargo Insurance.  Plaintiffs also alleged that Wells Fargo improperly back-dated insurance policies by retroactively purchasing insurance to cover periods in which no claims were made and no loss occurred.  Courts faced with similar kickback or backdating allegations have held that, while the lender may have broad discretion under the contract to require and procure insurance, such discretion is not unlimited.  Imposing inflated or illusory charges may not be authorized under the express terms of the contract.  *See, e.g., McNeary-Calloway v. JP Morgan Chase Bank, N.A.,* 863 F. Supp. 2d 928, 956 (N.D. Cal. 2012) (Magistrate Judge Joseph Spero).

Regarding the kickback scheme, plaintiffs alleged that Wells Fargo entered into an exclusive purchase arrangement with QBE, under which Wells Fargo agreed to purchase all of its flood insurance policies from QBE.  In exchange, QBE agreed to pay Wells Fargo or its affiliates "a kickback equal to 10% to 20% of the premium for every force-placed insurance

United States District Court

For the Northern District of California

1    policy" (Compl. ¶ 3). Because the insurance was obtained pursuant to the exclusive

2    arrangement, no commission was justied. Plaintiffs further alleged that Wells Fargo charged

3    "exorbitant rates" that were "not arrived at on a competitive basis and were well in excess of

4    those which could have been obtained in the open market . . . ." (*id*. at ¶ 40). QBE's policies

5    were two to ten times the market rate for insurance (*id*. at ¶ 6). As the commission was tied to

6    the cost of the force-placed insurance as a percentage of the policy premium, Wells Fargo was

7    incentivized to purchase excessively-priced insurance policies from QBE in amounts as high as

8    possible.

9            Based on these allegations, this order finds that plaintiffs have sufficiently stated a claim

10   for breach of contract or breach of the implied covenant of good faith and fair dealing with

11   respect to the kickback allegations. Although Arkansas law does not recognize a separate claim

12   for relief for breach of the implied covenant, plaintiffs may proceed on such a theory as part of

13   their claim for breach of contract. *See, e.g., B&B Hardware, Inc. v. Fastenal Co.*, No. 10-00317,

14   2011 WL 825712, at *3 (E.D. Ark. Mar. 3, 2011). Self-dealing by Wells Fargo in the

15   procurement of the insurance and passing along false or unjustified charges may exceed the

16   authorization and discretion provided by the parties' agreement. Moreover, under the mortgage

17   agreement, the lender's discretion is limited to doing that which is "reasonable or appropriate" to

18   protect its interest in the property. On this record, this order cannot find as a matter of law that

19   plaintiffs fail to state a claim for breach of contract on the kickback allegations. *See, e.g.,*

20   *Amerifactors Fin. Group LLC v. Windstream Supply LLC*, No. 12-202, 2012 WL 2702959, at *2

21   (E.D. Ark. July 6, 2012) ("A breach of the implied covenant of good faith and fair dealing

22   remains nothing more than evidence of a possible breach of a contract between parties.")

23           Plaintiffs have not, however, sufficiently alleged that Wells Fargo engaged in improper

24   backdating of insurance procured for plaintiffs' property. The complaint contains only a single

25   paragraph of conclusory allegations that Wells Fargo retroactively purchased insurance policies

26   for periods of time where coverage had lapsed but no claims had been made (Compl. ¶ 52).

27   Plaintiffs have not stated a viable claim for breach of contract based on alleged backdating of

28

insurance policies.  Nor are these allegations sufficiently pled  to state a claim based on backdating as related to plaintiffs' other claims for relief.

### 5.   UNJUST ENRICHMENT AND CONVERSION CLAIMS.

Based on the above analysis, plaintiffs have adequately stated a claim for unjust enrichment and conversion on their kickback allegations.  To state a claim for unjust enrichment, "a party must have received something of value, to which he or she is not entitled and which he or she must restore," and that there was some act, intent or situation that made the enrichment unjust and compensable.  "In short, an action based on unjust enrichment is maintainable where a person has received money or its equivalent under such circumstances that, in equity and good conscience, he or she ought not to retain."  *Campbell v. Asbury Auto., Inc*., 381 S.W.3d 21, 36 (Ark. 2011).

Wells Fargo contends that under Arkansas law, no claim for unjust enrichment may be pled where a written contract exists covering the subject matter.  The Arkansas Supreme Court, however, has made clear that "the mere existence of a contract between the parties does not automatically foreclose a claim of unjust enrichment.  When an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice." *Campbell*, 381 S.W.3d at 37.  So too here.  Plaintiffs have sufficiently alleged a scheme whereby Wells Fargo entered into exclusive contracts to purchase insurance from QBE, then received a commission for placing insurance on plaintiffs' property while also passing onto plaintiffs the cost of the commission.  Even if this were not found to breach an express or implied contract provision, plaintiffs would conceivably be able to recover under the equitable theory of unjust enrichment.

Similarly, plaintiffs have also adequately alleged a claim for conversion.  "The tort of conversion is committed when a party wrongfully commits a distinct act of dominion over the property of another which is inconsistent with the owner's rights." *Dent v. Wright*, 909 S.W.2d 302, 305 (Ark. 1995).  Whether Wells Fargo's actions were authorized is an issue to be determined at trial, or on summary judgment — not at the pleading stage.  Accordingly, Wells

1    Fargo's motion to dismiss the claims for unjust enrichment and conversion based on the

2    kickback allegations are **DENIED**.

3          **6.**        **BREACH OF FIDUCIARY DUTY CLAIM.**

4          Under Arkansas law, normally the relationship between creditor and debtor does not give

5    rise to any fiduciary duty.  The Supreme Court of Arkansas has stated that "[f]or a fiduciary

6    relationship to exist, this court has emphasized the necessity of factual underpinnings to establish

7    a relationship of trust between a bank and its customers, which is more than a debtor-creditor

8    relationship."  *Mans v. Peoples Bank of Imboden*, 10 S.W.3d 885, 889 (Ark. 2000).

9          Setting aside plaintiffs' claims that Wells Fargo was authorized to purchase insurance

10   only up to the amount of the principal loan balance, discussed above, plaintiffs essentially argue

11   that Wells Fargo created a fiduciary relationship by purchasing insurance and administering

12   plaintiffs' escrow account.  Plaintiffs contend that Wells Fargo knew that plaintiffs "were the

13   substantially weaker party and likely relied on its assessment of flood insurance requirements"

14   (Opp. 15).  Because Wells Fargo earned a greater profit through the kickbacks, and charged

15   excessive fees to plaintiffs' escrow account, plaintiffs contend that they have sufficiently pled a

16   claim for breach of fiduciary duty.  Whether Wells Fargo charged excessive fees or not,

17   however, plaintiffs must first establish the existence of a duty beyond the debtor-creditor

18   relationship.  Plaintiffs cite no authority in support of their position that the mere maintenance of

19   an escrow account for the payment of routine fees and expenses creates a fiduciary duty and

20   gives rise to a relationship that is "more than a debtor-creditor relationship" under Arkansas law.

21         Moreover, plaintiffs do not allege that there was any relationship of trust created.  The

22   mortgage agreement notified plaintiffs that they were required to maintain a certain amount of

23   insurance, in an amount set by Wells Fargo.  It further notified plaintiffs that Wells Fargo was

24   authorized to and would purchase such insurance for plaintiffs if necessary (Compl. Exh. A ¶ 5).

25   Plaintiffs were informed and acknowledged that the cost of insurance coverage that the lender

26   would obtain for them if they failed to do so "might significantly exceed the cost of insurance

27   that Borrower could have obtained," and that lender was "under no obligation to purchase any

28   particular type or amount of coverage" (*ibid.*)  Plaintiffs' conclusory allegations that a

relationship of trust existed or was created between the parties are insufficient to establish a fiduciary relationship.  Accordingly, the motion to dismiss the claim for breach of fiduciary duty is **GRANTED**.

**7.     WHETHER THE NATIONAL BANKING ACT PREEMPTS PLAINTIFFS' CLAIMS.**

Wells Fargo contends that all of plaintiffs' state law claims are preempted by the National Bank Act, 12 U.S.C. 21 *et seq.*  "The Act vests nationally chartered banks with enumerated powers, such as the power to make contracts, to receive deposits, and to make loans, together with 'all such incidental powers as shall be necessary to carry on the business of banking.'" *Gutierrez v. Wells Fargo Bank, NA.*, No. 10-17689, 2012 WL 6684748, at *7 (9th Cir. Dec. 26, 2012).

"Federal control shields national banking from unduly burdensome and duplicative state regulation." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007).  States "are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its federal powers." *Id.* at 12.  When, however, state laws "significantly impair the exercise of authority, enumerated or incidental under the [Act], the state's regulations must give way." *Ibid.*

As the agency charged with administering the Act, the OCC has the power to promulgate regulations and to use its rulemaking authority to define the "incidental powers" of national banks beyond those specifically enumerated in the statute. *See* 12 U.S.C. 93a.  OCC regulations have the same preemptive effect as the Act itself. *See Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 555 (9th Cir. 2010).  "The Act and OCC regulations do not 'preempt the field' of banking in its entirety." *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1130 (N.D. Cal. 2010) *aff'd in part, rev'd in part*, 2012 WL 6684748 (emphasis in original). "Federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the [Act]." *Watters*, 550 U.S. at 11 (citations omitted).  "State laws of general application, which merely require all businesses (including national banks) to refrain from fraudulent, unfair, or illegal

17

behavior, do not necessarily impair a bank's ability to exercise its . . . powers." *Gutierrez*, 2012 WL 6684748 at *12 (quoting *Martinez,* 598 F.3d at 555).

Wells Fargo contends that plaintiffs' state law claims challenge its activities in areas identified by the OCC as those where national banks may make real estate loans "without regard to state law limitations concerning":

> (2) The ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements or risk mitigants, in furtherance of safe and sound banking practices; . . .
>
> (4) The terms of credit, including schedule for repayment of principal and interest, amortization of loans, balance, payments due, minimum payments, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan; . . .
>
> (6) Escrow accounts, impound accounts, and similar accounts; . . .
>
> (9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents . . . .

12 C.F.R. § 34.4(a).  The regulation further provides that state laws regarding, *inter alia*, contracts and torts, "are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent consistent with the decision of the Supreme Court in *Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al.*, 517 U.S. 25 (1996)."  12 C.F.R. § 34.4(b).

Wells Fargo contends that plaintiffs' lawsuit "interferes directly" with the bank's ability to freely procure insurance, and to pay a commission to its affiliate for so doing.  Moreover, plaintiffs challenge Wells Fargo's "pass[ing] through the premium it paid" for the insurance.  Wells Fargo misconstrues plaintiffs' allegations, as pled in their complaint and as limited herein by this order.  Plaintiffs seek to enforce the terms and covenants agreed to by the parties, an area governed by state contract law and explicitly identified as among the areas of state law generally not preempted by the OCC regulations.  Wells Fargo has pointed to no federal law that restricts the parties' ability to privately contract with respect to the mortgage and servicing of plaintiffs' loan, including agreeing to terms and obligations separate and apart from that required or directly regulated by federal law.  Plaintiffs' claim for breach of contract, though it touches on

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

Wells Fargo's activities, is not preempted merely because it could be said to relate to the bank's activities as lender and servicer. "Where, as here, federal laws do not cover a bank's actions, states 'are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers." *Gutierrez*, 2012 WL 6684748 at * 12 (quoting *Watters*, 550 U.S. at 12).

Similarly, the United States Court of Appeals for the Seventh Circuit has noted in the context of the preemptive effect of the Home Owners Loan Act that the Office of Thrift Supervision's "assertion of plenary regulatory authority does not deprive persons harmed by the wrongful acts of savings and loan associations of their basic state common-law-type remedies." *In re Ocwen Loan Servicing, LLC Mortg. Servicing Litig.*, 491 F.3d 638, 643–44 (7th Cir. 2007). Enforcing state law, such as by allowing suit for a homeowner to enforce a savings and loan association's mortgage agreement, or a claim for fraudulent misrepresentation, "would complement rather than substitute for the federal regulatory scheme." *Ibid.* So too here.

Plaintiffs also challenge Wells Fargo's charge for commission fees that it actually received through its affiliate. That is, plaintiffs have alleged a scheme whereby Wells Fargo misrepresented the nature and purpose of supposed commission fees. Pursuant to this scheme, Wells Fargo did not perform any work in procuring an insurance policy because of the bank's exclusive purchase agreements with QBE. Wells Fargo nonetheless charged as costs to plaintiffs commission fees that it then received back through its affiliate. Wells Fargo essentially paid itself for work it did not do, passing through to plaintiffs an unjustified and illusory charge. Plaintiffs' claims thus do not affect Wells Fargo's ability to set fees or prices; rather, the core of the allegations is that Wells Fargo wrongfully charged plaintiffs for work that it neither actually performed nor actually paid for. As in *Gutierrez*, Wells Fargo has not pointed to any provision of the National Banking Act or OCC regulations that "regulates deceptive statements vis-a-vis the bank's [charging of commissions]." 2012 WL 6684748 at *12. At this early stage of the litigation, plaintiffs' common law claims have not been shown to be preempted, nor has Wells Fargo demonstrated that refraining from the challenged wrongful conduct would "prevent or

United States District Court

For the Northern District of California

1    significantly interfere with its ability to engage in the business of banking." *Ibid.* Accordingly,

2    the motion to dismiss plaintiffs' state law claims on the ground of preemption is DENIED.

3        **8.    TRUTH IN LENDING ACT.**

4        The purpose of the TILA is "to assure a meaningful disclosure of credit terms so that the

5    consumer will be able to compare more readily the various credit terms available to him and

6    avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair

7    credit billing and credit card practices." 15 U.S.C. 1601(a). "Accordingly, [TILA] requires

8    creditors to provide borrowers with clear and accurate disclosure of terms." *Beach v. Ocwen*

9    *Fed. Bank*, 523 U.S. 410, 412 (1998). The Federal Reserve Board promulgated regulations

10   under the TILA, known as Regulation Z. The regulations require lenders to provide material

11   disclosures to borrowers, which include "[p]remiums or other charges for insurance against loss

12   of or damage to property, or against liability arising out of the ownership or use of property,

13   written in connection with a credit transaction." 12 C.F.R. § 226.4(b)(8).

14       Plaintiffs have alleged that Wells Fargo violated 12 C.F.R. 226.17(c), which requires that

15   the disclosures "reflect the terms of the legal obligation between the parties." In an apparent

16   attempt to avoid the application of the one-year statute of limitations for damages under the

17   TILA, 15 U.S.C. 1640(e), plaintiffs contend that when Wells Fargo added hazard and flood

18   insurance premiums to plaintiffs' outstanding loan balance, "Wells Fargo changed the terms of

19   Plaintiffs' loan, thus creating a new loan obligation" (Opp. 18). Therefore, plaintiffs argue that

20   (1) the claims are not time-barred because Wells Fargo last purchased and charged plaintiffs for

21   insurance in September 2011, and (2) that Wells Fargo is liable as the originator, not the

22   assignee, of the new loan obligation.[4]

23       In light of this order's conclusion that purchase of flood and hazard insurance in excess

24   of the outstanding loan balance was authorized under the mortgage agreement, as long as

25   "reasonable or appropriate to protect" Wells Fargo's interest in the property, this order finds that

26   plaintiffs have not stated a claim under the TILA. Critically, plaintiffs' property was located in a

27

28       [4] Plaintiffs appear to have waived their allegations that equitable tolling should apply. Thus, this order need not determine whether plaintiffs have stated a viable claim for violations based on the initial loan disclosures.

20

United States District Court

For the Northern District of California

special flood hazard zone at the time they entered into the loan, and they therefore received and signed the flood zone notification form indicating that flood insurance would be required (Compl. ¶ 28). As this Court stated in *Hofstetter v. Chase Home Finance, LLC*, a lender cannot impose mandatory flood insurance requirements at a later date and at its sole discretion if the terms of the loan at consummation did not reserve the right to do so. 751 F. Supp. 2d 1116, 1125 (N.D. Cal. 2010). In *Hofstetter*, the plaintiffs entered into agreements for home-equity lines of credit secured by real property. At the time the agreements were entered into, the plaintiffs were not required to maintain any flood insurance, and were not informed that such a requirement would be imposed in the future. This Court found that the disclosures initially provided by the lender were insufficiently specific with regard to when and under what circumstances mandatory flood insurance requirements might be imposed at some later date. *Id.* at 1126. Here, however, plaintiffs were notified from the outset that flood insurance would be required. And, as discussed above, the lender was authorized, within the limits of the parties' agreement, to set the amount of flood insurance to be required.

Plaintiffs' reliance on decisions finding that charges for unauthorized insurance so altered the terms of the initial loan as to constitute a new transaction triggering new disclosure requirements is inapposite. For example, in *Morris v. Wells Fargo Bank N.A.*, No. 11-474, 2012 WL 3929805, at *12 (W.D. Pa. Sept. 7, 2012), the district court found that plaintiffs had pled a plausible claim under TILA that "force-placing unauthorized insurance constitute[d] a *new credit transaction* involving new finance charges within the scope of 12 C.F.R. § 226.18 where the amount of the plaintiff's indebtedness [] increased." (emphasis added). The court in *Morris* discussed a line of cases finding that the purchase of unauthorized insurance and addition of those premiums to the plaintiff's debt "constituted a new credit transaction" triggering the requirement of new disclosures. *Ibid.*; *see also Travis v. Boulevard Bank N.A.*, 880 F. Supp. 1226, 1229 (N.D. Ill. 1995). Here, Wells Fargo did not alter the terms of plaintiffs' loan by purchasing insurance in an amount provided for by the parties' agreement. Nor did the charge for commissions or fees in connection with the purchase of the insurance constitute a new credit transaction requiring new disclosures, where such insurance purchases were initially authorized.

**United States District Court**
For the Northern District of California

1    Plaintiffs have not stated a plausible claim for violations under the TILA; the claim is therefore

2    DISMISSED.

3        **9.      RESPA SECTION 2607.**

4        Plaintiffs allege that Wells Fargo violated the Real Estate Settlement Procedures Act by

5    accepting kickbacks in connection with force-placed insurance (Opp. at 19–20).  RESPA Section

6    2607(a)(2) provides that:

7            No person shall give and no person shall accept any fee, kickback, or
             thing of value pursuant to any agreement or understanding, oral or
8            otherwise, that business incident to or a part of a real estate settlement
             service involving a federally related mortgage loan shall be referred to
9            any person.

10   Under RESPA, the term "settlement service" includes:

11           [A]ny service provided *in connection with a real estate settlement*
             including, but not limited to, the following: title searches, title
12           examinations, the provision of title certificates, title insurance,
             services rendered by an attorney, the preparation of documents,
13           property surveys, the rendering of credit reports or appraisals, pest
             and fungus inspections, services rendered by a real estate agent or
14           broker, the origination of a federally related mortgage loan
             (including, but not limited to, the taking of loan applications, loan
15           processing, and the underwriting and funding of loans), and the
             handling of the processing, and closing or settlement . . . ."
16
     12 U.S.C. 2602(3) (emphasis added).
17
         Wells Fargo contends that the purchase of force-placed insurance for plaintiffs' property
18
     does not constitute a "settlement service" within the meaning of Section 2602(3).  The insurance
19
     was not purchased until 2011, ten years after plaintiffs entered into their mortgage agreement.
20
     As stated by our court of appeals, RESPA's list of settlement services "suggests a limitation to
21
     costs payable at or before settlement," as compared to fees and services assessed at a later time.
22
     *Bloom v. Martin*, 77 F.3d 318, 321 (9th Cir. 1996).  Plaintiffs acknowledge that "no court has
23
     allowed RESPA claims for post-origination force-placed insurance schemes" (Opp. 19 fn 15).
24
     This order agrees with the weight of decisions in this district and others that have determined
25
     that a lender's purchase of force-placed insurance years after the mortgage agreement was signed
26
     and the house was bought does not constitute a "service provided in connection with a real estate
27
     settlement."  *See, e.g., McNeary-Calloway*, 863 F. Supp. 2d at 953–54; *Morris v. Wells Fargo*
28

*Bank N.A.*, No. 11-cv-474, 2012 WL 3929805, *15–16 (W.D. Pa. Sept. 7, 2012).  Plaintiffs'

RESPA claim is therefore **DISMISSED**.

### CONCLUSION

For the reasons stated above, defendant Wells Fargo's motion to dismiss is granted in

part and denied in part.  Plaintiffs may seek leave to amend their complaint, and may do so by

filing a motion for leave to file an amended complaint by **FEBRUARY 14**.  The proposed amended

complaint must be appended to the motion, which should clearly identify how the proposed

complaint cures the deficiencies identified herein.  If no motion is filed by February 14, Wells

Fargo must file an answer to the complaint by **FEBRUARY 21**.  Plaintiffs' motion for leave to file

an amended complaint, filed on January 18 (Dkt. No. 63), is **DENIED AS MOOT**.


**IT IS SO ORDERED.**


Dated:  January 24, 2013.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE