Sheri L. Kelly, SBN 226993
E-mail: slk@sherikellylaw.com
LAW OFFICE OF SHERI L. KELLY
31 E. Julian St.
San Jose, CA  95112
Telephone:  408/287-7712
Facsimile:  408/583-4249

Attorney for Plaintiffs
Additional Counsel Listed on Signature Page

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| DANNY LANE, BEVERLY LANE, and MERCEDES GUERRERO individually, and for other persons similarly situated,<br><br>     Plaintiffs,<br><br>vs.<br><br>WELLS FARGO BANK, N.A.,<br><br>     Defendant. | Case No. CV-12-4026 WHA<br><br>**FIRST AMENDED COMPLAINT CLASS ACTION**<br><br>**JURY TRIAL DEMANDED**<br><br>Judge: Hon. William H. Alsup<br><br>Action Filed: July 31, 2012<br>Trial Date: April 21, 2014 |

Plaintiffs Danny Lane, Beverly Lane, and Mercedes Guerrero, acting individually and on behalf of all others similarly situated, for their First Amended Complaint and demand for jury trial, state and allege as follows:

## NATURE OF THE ACTION

1.     This is an action seeking damages, injunctive relief, equitable relief, and other relief against Wells Fargo Bank, N.A., for entering into wrongful and collusive business deals with force-placed insurance companies relating to force-placed flood and hazard insurance.

2.     Wells Fargo is among the country's largest residential mortgage lenders and loan servicers. The mortgages Wells Fargo services require the borrowers to maintain acceptable flood and hazard insurance on the residential property securing their loans. When borrowers do not obtain insurance coverage in the amounts Wells Fargo requires, it exercises its right to purchase insurance for the borrower. This practice is called "force-placing" insurance. This is standard an appropriate.

3.     What is not standard and appropriate is Wells Fargo's exploitative and self-dealing arrangements with force-placed insurers.

4.     Wells Fargo entered into a series of exclusive purchasing arrangements with two force-placed insurance companies, American Security Insurance Company (ASIC) and QBE Insurance Corporation (QBE).

5.     Under these agreements, which are not based upon competitive or market pricing, ASIC and QBE agreed to pay a kickback of 10%-20% of every force-placed insurance premium to Wells Fargo or its affiliate, Wells Fargo Insurance, Inc.

6.     In return, Wells Fargo agreed to purchase all force-placed insurance from ASIC or QBE. Wells Fargo partitioned its mortgage portfolio between ASIC and QBE, assigning insurance policies between the two based on criteria not yet known to Plaintiffs. For example, Wells Fargo may

1   have purchased all force-placed insurance from QBE prior to 2012 and switched to ASIC after 2012,

2   purchased hazard insurance from QBE and flood insurance from ASIC, or purchased all force-placed

3   insurance for borrowers in some states (such as Arkansas) from QBE and other states (such as

4   California) from ASIC.

5          7.     ASIC and QBE charge at least twice as much, and sometimes up to 10 times as much,

6   for flood and hazard insurance than other companies participating in the flood and hazard insurance

7   marketplaces. They are able to charge these rates because Wells Fargo provides them with a captive

8   market—all of Wells Fargo's borrowers.

9          8.     Wells Fargo outsources its insurance-related servicing responsibilities—such as

10   tracking insurance coverage on borrower's properties, sending notices related to insurance coverage

11   issues to borrowers, and force-placing insurance on borrowers' properties—to ASIC, QBE and their

12   affiliated entities. In effect, the company receiving force-placed insurance premiums is responsible

13   for determining who has to pay them. Wells Fargo pays ASIC and QBE for these services, but gets

14   the cost of these services returned when ASIC and QBE kick back a portion of every premium it

15   receives to Wells Fargo. Borrowers are forced to foot the bill for Wells Fargo's outsourcing

16   arrangement. The purpose of force-placed insurance is to protect the lender's interest in the property

17   securing a mortgage. The purpose is not to gouge the borrower solely to profit the mortgage servicer.

18   The purpose is not to shift the cost of the mortgage servicer's operations—such as keeping up with

19   the status of borrowers' insurance coverage, sending notices about deficient coverage, and the like—

20   to the borrower by outsourcing these operations to an insurance company that forces borrowers to pay

21   two to ten times the going rate for insurance.

22          9.     Wells Fargo uses its sister corporation, Wells Fargo Insurance, Inc., as the "insurance

23   agent" that gets paid for "finding" and placing the force-placed insurance policies. It thus

24

characterizes the kickbacks as insurance agent "commissions." But there is no "finding" involved. Wells Fargo Insurance, Inc. performs no services whatsoever for individual borrowers and performs none of the services insurance agents typically perform to earn commissions. Wells Fargo already has written contracts with ASIC and QBE that agree to purchase all force-placed insurance for Wells Fargo borrowers from ASIC and QBE. These payments are not "commissions." They are kickbacks.[1]

10.     Wells Fargo charges borrowers' mortgage escrow accounts for force-placed insurance premiums and Wells Fargo Insurance, Inc.'s kickbacks. It increases borrowers' monthly mortgage payments to recoup the escrow deficiency created when Wells Fargo withdraws these premiums and kickbacks. If the borrower refuses or fails to pay, Wells Fargo adds the premiums to the borrower's mortgage balance and charges the borrower interest on these charges. Wells Fargo can coerce payment of these premiums and kickbacks with threats of negative credit reporting and foreclosure if the borrower refuses to pay.

11.     Plaintiffs allege that (1) Wells Fargo entered into a hidden arrangement with ASIC and QBE to receive a kickback of a portion of every force-placed insurance policy it bought for its borrowers, (2) Wells Fargo purchased the most expensive insurance policies available for its borrowers to increase the amount of each kickback, and (3) Wells Fargo required backdated insurance to increase the number of kickbacks it could receive.

12.     Wells Fargo's practices alleged in this Amended Complaint constitute a breach of contract and breach of the implied covenant of good faith and fair dealing, violate the anti-tying provisions of the Bank Holding Company Act, violate California Bus. & Prof. Code § 17200, unjustly enriched the defendant, and constitute conversion.

13.     Plaintiffs seek to recover damages equal to (1) Wells Fargo's kickbacks, (2) the excess

---

[1] "**Kickback**, *n.* (1920) A return of a portion of a monetary sum received, esp. as a result of coercion or a secret agreement." Black's Law Dictionary (9th Ed. 2009).

*FIRST AMENDED COMPLAINT*
*CASE NO. CV-12-04026 WHA*

1   cost of force-placed insurance resulting from Wells Fargo's exclusive business deals and kickback

2   arrangements, and (3) three times the amount of Wells Fargo's kickbacks pursuant to the Bank

3   Holding Company Act, as well as injunctive and equitable relief.

4                                   **JURISDICTION AND VENUE**

5          14.    This Court has jurisdiction over this action under the Class Action Fairness Act of

6   2005, 28 U.S.C. §§ 1332(d)(2) and (6), because the aggregate claims of the putative Class members

7   exceed $5 million, exclusive of interest and costs, and because at least one Plaintiff is a citizen of a

8   different state than Wells Fargo.

9          15.    This Court also has original jurisdiction over Plaintiffs' federal claims pursuant to 28

10  U.S.C. § 1331. Plaintiffs' state law claims arose out of the same transaction and occurrence as their

11  BHCA claims—specifically, all claims arose out of Wells Fargo's kickback scheme—and are so

12  related to Plaintiffs' BHCA claims that they form part of the same case or controversy.

13         16.    Venue is proper in this district pursuant to 28 U.S.C. § 139, because Wells Fargo is

14  subject to personal jurisdiction, because its principal place of business is 420 Montgomery Street, San

15  Francisco, California 94163, and because a substantial part of the acts or omissions giving rise to the

16  claims herein occurred and continue to occur in this district.

17                                          **PARTIES**

18         17.    Danny Lane and Beverly Lane are, and at all relevant times have been, residents of

19  Arkansas County, Arkansas.

20         18.    Mercedes Guerrero is, and at all relevant times has been, a resident of Mojave, Kern

21  County, California.

22         19.    Defendant WELLS FARGO BANK, N.A. is a national bank registered to do business

23  in the State of California with its principal address in San Francisco, California. As a result of a 2004

24

---

4

merger, Wells Fargo Bank, N.A. is the successor to Wells Fargo Home Mortgage, Inc., which no longer exists. Wells Fargo Bank, N.A. sometimes does business under the name Wells Fargo Home Mortgage.

## FACTUAL ALLEGATIONS

**A.      Wells Fargo's Role as Mortgage Servicer**

20.      Wells Fargo provides services including, but not limited to, banking, insurance, investments, mortgage lending, mortgage servicing, and consumer and commercial finance across North America. It services approximately 9 million mortgages, and has assets of $1.2 trillion.

21.      Wells Fargo's mortgage business includes mortgage servicing, mortgage lending, and purchasing mortgages on the secondary market.

22.      A mortgage servicer is an entity that provides certain functions on behalf of the lender or owner of the mortgage. The heart of the mortgage servicer's job is to collect payments on behalf of the third party that owns the mortgage and is entitled to receive payments under the mortgage.

23.      As servicer, Wells Fargo's responsibilities included sending monthly mortgage statements, collecting monthly mortgage payments, collecting and maintaining escrow accounts for the payment of insurance on properties used to collateralize loans, paying for such insurance on those properties from borrower's escrow accounts, monitoring and ensuring that all required forms of insurance are in full force and effect, notifying borrowers of insurance lapses and other required actions, procuring and paying for force-placed insurance, and accounting for and remitting borrowers' payments to the owner of each borrower's mortgage.

24.      Wells Fargo outsources some of its responsibilities as servicer to third parties. Wells Fargo delegates many of its insurance-related responsibilities to ASIC, QBE, and their respective affiliates.

**B.     ASIC's and QBE's Role as an Outsourcer and Insurance Company**

25.     Wells Fargo outsources many of its servicing responsibilities described above to ASIC and QBE. Under this outsourcing arrangement, ASIC and QBE, or other companies owned by their corporate parents, send letters on Wells Fargo letterhead stating when borrowers need to increase their insurance coverage, and force-place coverage on borrowers' property if the borrowers do not obtain sufficient coverage to meet Wells Fargo's requirements.

26.     As part of this "bundle" of services, Wells Fargo also authorizes ASIC and QBE, or their respective affiliates, to purchase every force-placed policy for Wells Fargo's borrowers from ASIC and QBE. In return for this lucrative business, every time ASIC or QBE force-places an insurance policy on one of Wells Fargo's borrowers' property, they pay a portion of the premium to Wells Fargo, or its affiliate Wells Fargo Insurance, Inc.

**C.     Facts as to Danny and Beverly Lane**

27.     On or about April 25, 2001, Plaintiffs Danny and Beverly Lane obtained their mortgage loan from Freedom Financial Services of Arkansas, Inc. After the closing of the loan, the note and mortgage were ultimately purchased by Wells Fargo. A true and correct copy of the mortgage is attached as **Exhibit A.**

28.     Pursuant to the mortgage, Mr. and Mrs. Lane are required to insure the improvements on the real property:

> 5.     Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires . . . The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably . . .
>
> If Borrower fails to maintain any of the coverages described above, Lender may obtain

insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable with such interest, upon notice from Lender to Borrower requesting payment.

29.    Plaintiffs' mortgage was a Fannie Mae/Freddie Mac form mortgage. Most of the mortgages Wells Fargo serviced during the Class period were, likewise, Fannie Mae/Freddie Mac mortgages written on Fannie Mae and Freddie Mac's uniform security instruments that contain property insurance provisions that are identical to those in Section 5 of Plaintiffs' mortgage.

30.    While this standardized provision states that the "cost of the [force-placed] insurance so obtained might significantly exceed the cost of insurance that Borrower could have obtained," it does not authorize or contemplate that Wells Fargo or an affiliate will derive a hidden profit or financial benefit by procuring force-placed insurance exclusively from QBE and ASIC. Nor does it authorize Wells Fargo to add these hidden kickbacks as additional debt of the borrower.

31.    Plaintiffs also signed special flood and hazard insurance notices in connection with their mortgage setting out their minimum flood and hazard insurance requirements.

32.    Wells Fargo Home Mortgage began servicing Plaintiffs' mortgage on or about April 25, 2001 and continued to do so until Wells Fargo Home Mortgage and Wells Fargo merged. Since the merger, Wells Fargo has serviced Plaintiffs' mortgage.

33.    Wells Fargo has incrementally increased the amount of flood and hazard insurance Plaintiffs were required to maintain, ultimately raising its insurance requirements to such an extent that Mr. and Mrs. Lane were forced to accept force-placed insurance purchased by Wells Fargo.

34.     For example, on September 9, 2011, Wells Fargo force-placed Plaintiffs into $52,000 of flood insurance. On that same day, Wells Fargo force-placed Plaintiffs into a separate hazard insurance policy in the amount of $52,000. Both policies were placed with QBE. The effective date for these policies fell on a date several weeks prior to the date Wells Fargo purchased the policies for Plaintiffs.

35.     Wells Fargo withdrew the premiums for these policies from Plaintiffs' escrow account then required Plaintiffs to increase their monthly mortgage payments to replenish their escrow account. Plaintiffs paid these amounts.

36.     Wells Fargo's affiliate, Wells Fargo Insurance, Inc., kept a portion of the premium for the two force-placed insurance policies. It remitted some or all of these kickbacks to Wells Fargo Bank, N.A. in the form of "soft dollar transactions." "Soft dollar transactions" are transactions that involve transferring funds through reductions of liabilities or increases in assets on different companies' books. For example, if Wells Fargo owed $30 to Wells Fargo Insurance, Inc. for services provided to Wells Fargo, Wells Fargo Insurance, Inc. could transfer $30 of kickbacks to Wells Fargo by eliminating that liability for Wells Fargo.

37.     Plaintiffs lack administrative remedies to address the wrongful conduct alleged herein.

38.     All conditions precedent to the relief sought herein have been performed, occurred or been waived.

**D.     Facts as to Mercedes Guerrero**

39.     Mercedes Guerrero is a California resident who obtained her mortgage loan from Washington Mutual Bank, FA.

40.     Pursuant to the mortgage, Ms. Guerrero is required to insure the improvements on her real property:

4. Fire, Flood and Other Hazard Insurance. Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

41. Plaintiffs' mortgage was a FHA form mortgage. Many of the mortgages Wells Fargo serviced during the class period were, likewise, FHA mortgages written on forms produced by the Federal Housing Administration that contain insurance provisions that are identical to those in Section 4 of Plaintiff's mortgage. Ms. Guerrero has not yet located her copy of her mortgage and attaches a representative form as prepared by the Federal Housing Administration showing all terms contained in the FHA form mortgage as **Exhibit B**. The FHA form mortgage has not changed in any considerable respect between the date Ms. Guerrero obtained her FHA mortgage and the date of **Exhibit B**, so **Exhibit B** accurately represents the terms of Ms. Guerrero's mortgage. The relevant terms of FHA mortgages do not differ from borrower to borrower but are identical for all FHA borrowers.

42. Section 7 of the FHA form mortgage limits the lender's rights in the event the borrower defaults on any of the covenants contained in the mortgage, including maintaining adequate insurance. It allows the lender to "do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items . . . ." Section 8 limits fees the lender may charge to "fees and charges authorized by the Secretary."

43. This does not authorize or contemplate that Wells Fargo or an affiliate will derive a hidden profit or financial benefit by procuring force-placed insurance exclusively from QBE or

ASIC. It does not authorize Wells Fargo to add these hidden kickbacks to Plaintiff's mortgage balance. The Secretary (the Secretary of Housing and Urban Development) does not allow a mortgage servicer to charge commissions paid to its affiliate to a borrower when that affiliate provides no services for borrowers.

44.    Wells Fargo began servicing Plaintiff's mortgage during or before 2010 and continued to do so until the present.

45.    Wells Fargo increased the amount of flood insurance Plaintiff was required to maintain. It force-placed Ms. Guerrero into additional insurance when she was not able to keep up with Wells Fargo's requirements.

46.    In August of 2009, Ms. Guerrero maintained $170,000 in flood insurance through American Bankers Insurance Company of Florida. This amount was the replacement cost value of her home according to her insurance agent. The policy included an additional $30,000 in contents coverage. The total premium for this policy was $992, which included $771 for $170,000 in coverage for Ms. Guerrero's home, $217 for $30,000 in coverage for the contents of Ms. Guerrero's home, plus $110 in fees less $106 in discounts. For building coverage alone, Ms. Guerrero paid $771 for $170,000 in coverage, or about $0.0045 per one dollar of building coverage. The premium rates for Ms. Guerrero's $170,000 in building coverage increased marginally in August of 2010 and August of 2011, to $868, and $904, respectively. These new rates resulted in ratios of $0.00051, and $0.00053 for each dollar of coverage in 2010 and 2011, respectively.

47.    Ms. Guerrero maintained her $170,000 insurance policy with $30,000 in contents coverage with American Bankers Insurance Company of Florida in 2010, 2011, and 2012.

48.    On June 18, 2010, Wells Fargo force-placed an additional $75,000 of flood insurance on Ms. Guerrero's property, resulting in total insurance coverage of $245,000. It purchased this

insurance from ASIC. This policy provided no contents coverage. The total premium for this policy was $675, or about $0.009 for every one dollar in insurance. This insurance was twice as expensive as Ms. Guerrero's voluntary insurance coverage in effect at that time, when considering each policy's cost for "building only" coverage. It did not provide any contents coverage. The policy's effective date was June 10, 2010.

49. Wells Fargo Insurance, Inc. received a portion of this $675 flood insurance premium.

50. On June 24, 2011, Wells Fargo again force-placed $75,000 of flood insurance on Ms. Guerrero's property. It purchased this insurance from ASIC. This policy provided no contents coverage. The total premium for this policy was $675. Each dollar of building coverage provided by the force-placed policy cost 176% of the cost of each dollar of Ms. Guerrero's voluntary building coverage in effect at that time, as described above. The policy's effective date was June 10, 2011. Wells Fargo Insurance, Inc. received a portion of this $675 flood insurance premium.

51. On November 25, 2011, Wells Fargo again force-placed an additional $75,000 of flood insurance on Ms. Guerrero's property. It purchased this insurance from ASIC. This policy provided no contents coverage. The total premium for this policy was $675. Each dollar of building coverage provided by the force-placed policy cost 170% of the cost of each dollar of Ms. Guerrero's voluntary building coverage in effect at that time, as described above. The policy's effective date was October 7, 2011, a month and a half prior to the date of placement. Wells Fargo Insurance, Inc. received a portion of this $675 flood insurance premium.

52. Wells Fargo withdrew the premiums for ASIC's force-placed insurance policies and Wells Fargo Insurance, Inc.'s kickbacks from Ms. Guerrero's mortgage escrow account up front. Wells Fargo paid these costs initially then required Ms. Guerrero to increase her monthly mortgage payments to fund the escrow deficiency created by the withdrawal. For example, in November 2011,

Wells Fargo withdrew $775.83 from Ms. Guerrero's escrow account to pay "American Security Group." Wells Fargo increased Ms. Guerrero's escrow payments by $64.65 per month to pay for ASIC's premiums and Wells Fargo Insurance, Inc.'s kickbacks. Ms. Guerrero made these increased payments each month from November 2011 through October 2012.

53.     Wells Fargo's affiliate, Wells Fargo Insurance, Inc., kept a portion of the premium for each force-placed insurance policy. It remitted some or all of these kickbacks to Wells Fargo Bank, N.A. in the form of "soft dollar transactions." "Soft dollar transactions" are transactions that involve transferring funds through reductions of liabilities or increases in assets on different companies' books. For example, if Wells Fargo owed $30 to Wells Fargo Insurance, Inc. for services provided to Wells Fargo, Wells Fargo Insurance, Inc. could transfer $30 of kickbacks to Wells Fargo by eliminating that liability for Wells Fargo.

54.     Plaintiff lacks administrative remedies to address the wrongful conduct alleged herein.

55.     All conditions precedent to the relief sought herein have been performed, occurred, or been waived.

**E.     Facts Common to the Classes**

56.     Each and every mortgage at issue in this litigation requires borrowers, including Plaintiffs, to maintain insurance on their real property. If the borrower fails to maintain the requisite insurance, the mortgage servicer may force-place insurance on the property.

57.     The mortgages at issue in this litigation are Fannie Mae and FHA form mortgages written on standardized residential mortgage instruments that contain substantially identical provisions regarding insurance and fees that may be imposed in connection with force-placed insurance to those cited above (section 5 of **Exhibit A** and section 4 of **Exhibit B**).

58.     Pursuant to the mortgage contracts at issue, once an insurance policy has lapsed, the

mortgage servicer can force-place (purchase) insurance for the home, and then charge the borrower the full cost of the premium. However, these premiums are not the actual amount that Wells Fargo pays, because a substantial portion of the premiums are refunded to Wells Fargo through kickbacks or unearned "commissions."

59.     In accomplishing this force-placement, Wells Fargo, in bad faith, entered into secret agreements with QBE and ASIC to guarantee that QBE and ASIC would be the exclusive force-placed insurance providers for all force-placed policies on mortgages Wells Fargo services. Under this arrangement Wells Fargo charges exorbitant rates to Plaintiffs and the Class who have no way of refusing the force-placed charges. These premium rates or charges were not arrived at on a competitive basis and were well in excess of those which could have been obtained in the open market by Wells Fargo, Plaintiffs or the Classes. No good faith, arms-length transactions take place between Wells Fargo and QBE or ASIC. Rather, the pricing is the result of collusion between Wells Fargo and QBE or ASIC. QBE and ASIC agree to pay kickbacks to Wells Fargo to have access to a captive market of Wells Fargo's 9 million mortgagors, so they are insulated from competitive pressures in determining their insurance rates.

60.     The premiums on force-placed insurance policies generally cost at least two times, and up to ten times, more than what the borrower was either originally paying or what the borrower could obtain if he or she purchased the insurance on a competitive basis on the open market. For example, Ms. Guerrero's voluntary insurance policy with American Bankers Insurance Company provided $170,000 in building coverage and $30,000 in contents coverage for total coverage of $200,000. The building only premium for this policy was $771. The total premium for this policy, including contents coverage and various fees and discounts was $992. For building coverage alone, Ms. Guerrero paid $771 for $170,000 in coverage, or about $0.0045 per dollar of building coverage. Wells Fargo's

force-placed insurance policy for Ms. Guerrero's home provided $75,000 in building coverage and cost $675 in premiums, or about $0.009 per dollar of building coverage, which is exactly twice as costly per dollar of coverage as Ms. Guerrero's voluntary coverage. Even including Ms. Guerrero's higher premium for contents coverage and various fees for the insurance policy, her $200,000 in total coverage cost just $992, or about $0.00496 per dollar of coverage, which is a little over half the cost of ASIC's policy.

61.     Force-placed insurance policies are extremely lucrative for ASIC and QBE, and generate extremely high profit margins. Assurant, Inc., ASIC's parent company, collected $2.7 billion of premiums in 2010 through its force-placed insurance division alone. Assurant, Inc.'s family of companies paid out claims equaling only 36% of this take. With Assurant's other lines of business, the norm is a 70% claims-to-premiums ratio. 40% of the $2.7 billion in revenue is consumed by "general expenses," largely kickbacks to banks and their affiliates described as "commissions." In other lines of insurance, overhead and general expenses are usually only a fraction of policyholder claims. The difference is clear in Ms. Guerrero's voluntary and force-placed insurance policies. Ms. Guerrero purchased her voluntary insurance coverage from American Bankers Insurance Company of Florida, which is a subsidiary of Assurant, Inc., ASIC's parent corporation. Wells Fargo purchased Ms. Guerrero's force-placed insurance policy from ASIC. The force-placed policy cost twice as much for each dollar of building coverage. This shows the anti-competitive effect of Wells Fargo's exclusive purchase agreements with ASIC and QBE. Zero competition doubles the cost of insurance.

62.     Wells Fargo, QBE, and ASIC have reaped excessive profits relating to force-placed insurance.

63.     Wells Fargo receives commissions or kickbacks from QBE and ASIC when the high-priced, force-placed, insurance policies are purchased. These kickbacks are directly tied to the cost of

the force-placed insurance and are usually a percentage of the premium for the policy.

64. This kickback arrangement provides the mortgage servicer with an incentive to purchase the highest priced force-placed insurance policy on a non-competitive basis that it can—the higher the cost of the insurance policy, the higher their kickback. The consumer pays the bill for this anti-competitive scheme. Wells maximizes the amount of its commissions or kickbacks by force-placing borrowers into insurance policies in excess of the amounts required by federal law, in amounts greater than the note owner's secured interest in the property, and contrary to the amounts agreed upon in the homeowner's loan and mortgage documents.

65. The commission or kickback is paid by QBE and ASIC to Wells Fargo in order to maintain their pre-existing uncompetitive and exclusive relationship, to induce Wells Fargo to purchase excessively-priced force-placed insurance policies from QBE and ASIC, and to cause Wells Fargo to not seek competitive bids in the market.

66. Wells Fargo, QBE, and ASIC have entered into an arrangement such that a competitively priced insurance policy is not actually "found" for any given property. Therefore, the notion that any "commission" is due to Wells Fargo or its affiliates is false. Rather, Wells has a pre-set arrangement by which ASIC and QBE have access to and search Wells Fargo's database to find lapsed insurance policies. Then ASIC and QBE write to the homeowners to notify them of the force-placed coverage. Assuming there is a lapse in coverage, insurance is automatically placed—the provider of the insurance and the cost of the insurance are pre-determined under this relationship. Further, the cost of the insurance for each home bears no relation to each homeowner's individual home. Rather it is pre-determined based upon Well Fargo's entire portfolio of mortgages.

67. Therefore, the borrower paying QBE's and ASIC's premium rates is not just paying QBE and ASIC for force-placed insurance. The borrower is also paying QBE and ASIC for a bundle

of services, including performing Well Fargo's job of administering and servicing the mortgages (monitoring Wells Fargo's entire portfolio for lapses and providing notification to homeowners). This bundle of administrative services includes Wells Fargo's cost of monitoring and servicing its entire portfolio of loans and is not chargeable to Plaintiffs under the mortgages. The lender that owns the mortgage, on whose behalf Wells Fargo services the mortgages, already pays Wells Fargo for these services, so Wells Fargo's kickback arrangement ensures that it gets paid twice—once by the lender, and again by the borrower.

68.     Under this arrangement, the "premiums" for insurance that are charged to the Plaintiffs are exorbitant and illegal because they not only include the excessive cost of insurance, but they also include illegal kickbacks and the cost of the bundle of administrative services that ASIC and QBE are providing to Wells Fargo that Wells Fargo has already been paid—by the owner of the mortgage—to perform.

69.     This anticompetitive arrangement insures that ASIC, QBE, and their affiliates are the only entities providing force-placed insurance for Wells Fargo borrowers, and the price of the premium far exceeds the market value of the insurance coverage.

70.     If the consumer cannot afford to pay the exorbitant premiums for force-placed insurance, the premiums are added to the mortgage's principal balance, and Wells Fargo can force payment of the premiums through the threat of negative credit reporting and foreclosure.

71.     Wells also force-places retroactive insurance policies covering periods of time in the past when coverage had lapsed. This is done despite the fact that there are no claims during the lapsed period and the homeowner has since secured standard insurance. For example, if a borrower's insurance coverage lapses, and the borrower renews or secures a new insurance policy one month later, Wells Fargo will charge them for one month of force-placed insurance. Retroactive force-

placing of insurance is an especially egregious practice given that the National Association of Insurance Commissioners has stated that insurance is "prospective in nature" and that policies should not be backdated.

72.     Backdating insurance policies allows Wells Fargo to increase the amount of kickbacks it receives from borrowers because (1) it pushes the start date of the insurance policy back, and (2) it allows Wells Fargo to determine retroactively that any period during which the borrower did not have their own insurance was a period during which ASIC, QBE, and Wells Fargo Insurance, Inc. "earned" their premiums and "commissions" and allow them to keep the portion of those premiums and "commissions" attributable to that time period.

73.     For example, on November 25, 2011, Wells Fargo force-placed Ms. Guerrero in $75,000 of flood insurance. The effective date on the policy was October 7, 2011, which was a month and a half prior to the purchase date for the policy. If Ms. Guerrero purchased the demanded insurance on November 7, 2011 and provided proof of her additional coverage to Wells Fargo on November 30, 2011, Wells Fargo would refund 11 months of the premiums for the force-placed policy, but allow ASIC to keep 1 month of premium and Wells Fargo Insurance, Inc. to keep a kickback on that amount of premium.

74.     The actions and practices described herein represent bad faith and unconscionable practices that are an abusive and unlawful exercise of the lender's authority under the contract. Force-placing these excessively priced insurance policies on Plaintiffs' and Class Members' mortgages without regard to the market price of similar policies is merely price-rigging the premiums for the sole purpose of maximizing Wells Fargo's profits through kickbacks paid from the premiums for the force-placed policies. This conduct is prohibited by state and Federal law.

75.     As a mortgage servicer, Wells Fargo has the right to purchase force-placed insurance,

but Wells Fargo must discharge this duty in good faith. Plaintiffs challenge Wells Fargo's practice and business arrangements that negate the market forces that regulate the price of insurance policies, and result in the highest possible insurance premium charges to homeowners, all for the sole purpose of generating large kickbacks to Wells Fargo from those premiums.

76.     Wells Fargo was not, and is not, authorized by any federal, state, or local governing body, contract, or agreement to manipulate the price of the force-placed insurance policies, and acted in bad faith as alleged above.

77.     These fraudulent practices have recently come under fire by all fifty State Attorneys General as part of a nationwide investigation.

## CLASS ALLEGATIONS

78.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a)(1)-(4) and (b)(3).

79.     The proposed Classes are defined as follows:

1.     **Bank Holding Company Act Class:** Class representatives Danny Lane, Beverly Lane, and Mercedes Guerrero bring their Bank Holding Company Act claims on behalf of a class of all persons with properties in the United States who were charged for force-placed insurance by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where such charges included funds used to pay a fee, commission, or other financial remuneration to Wells Fargo Insurance, Inc. or any of Wells Fargo Bank, N.A.'s affiliates.

2.     **Breach of FHA Contract Class:** Class representative Mercedes Guerrero brings her breach of contract, including the implied covenant of good faith and fair dealing, claim on behalf of a class of all persons with properties in the United States securing FHA mortgage loans owned and/or serviced by Wells Fargo who:
     (a) were charged for force-placed insurance by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where such charges included funds used to pay a fee, commission, or other financial remuneration to Wells Fargo Insurance, Inc. or any of Wells Fargo Bank, N.A.'s affiliates; or
     (b) were charged for force-placed insurance by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where the effective

date of the insurance policy temporally preceded the date on which the policy was purchased.

3.    **Breach of Fannie Mae/Freddie Mac Contract Class:** Class representatives Danny and Beverly Lane bring their breach of contract, including the implied covenant of good faith and fair dealing, claim on behalf of a class of all persons with properties in the United States securing Fannie Mae/Freddie Mac uniform mortgage loans owned and/or serviced by Wells Fargo who:

(a) were charged for force-placed insurance by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where such charges included funds used to pay a fee, commission, or other financial remuneration to Wells Fargo Insurance, Inc. or any of Wells Fargo Bank, N.A.'s affiliates; or

(b) were charged for force-placed insurance by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where the effective date of the insurance policy temporally preceded the date on which the policy was purchased.

4.    **California Unjust Enrichment (Restitution) and Conversion Class:** Class representative Mercedes Guerrero brings her unjust enrichment and conversion claims on behalf of a class of all persons with properties in the state of California who were charged for force-placed insurance by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where such charges included funds used to pay a fee, commission, or other financial remuneration to Wells Fargo Insurance, Inc. or any of Wells Fargo Bank, N.A.'s affiliates.

5.    **Arkansas Unjust Enrichment and Conversion Class:** Class representatives Danny and Beverly Lane bring their unjust enrichment and conversion claims on behalf of a class of all persons with properties in the state of Arkansas who were charged for force-placed insurance by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where such charges included funds used to pay a fee, commission, or other financial remuneration to Wells Fargo Insurance, Inc. or any of Wells Fargo Bank, N.A.'s affiliates.

6.    **California Business & Professions Code § 17200 Class:** Class representative Mercedes Guerrero brings her Cal. Business & Professions Code § 17200 claim on behalf of a class of all persons with properties in the state of California who

(a)    were charged for force-placed insurance by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where such charges included funds used to pay a fee, commission, or other financial remuneration to Wells Fargo Insurance, Inc. or any of Wells Fargo Bank, N.A.'s affiliates; or

(b)    were charged for force-placed insurance by Wells Fargo Bank, N.A. or any of its affiliates within the applicable statute of limitations through the present where the effective date of the insurance policy temporally preceded the date on which the policy was purchased.

80.    Excluded from the Classes are Wells Fargo, its respective parents, subsidiaries, affiliates, officers, employees and directors, as well as any entity in which they have controlling

1    interests, and counsel for Plaintiffs.

2        81.    Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes

3    before the Court determines whether certification is appropriate.

4        82.    The members of the Classes are so numerous that joinder is impractical. The Classes

5    are believed to consist of thousands of members, whose identities are within the exclusive knowledge

6    of and can only be ascertained by resort to the records of Wells Fargo.

7        83.    There are questions of law and fact common to Plaintiffs and the Classes that

8    predominate over questions affecting individual Class members. These common questions include:

9        a.    Whether Defendant breached the mortgage contract with borrowers by charging

10            borrowers a high premium "cost" for force-placed insurance when, in reality, a

11            significant portion of this "cost" was actually returned, transferred, or paid to Wells or

12            an affiliate of Wells;

13       b.    Whether Defendant breached the implied covenant of good faith and fair dealing by

14            charging their residential borrowers amounts for force-placed insurance procured from

15            QBE or ASIC, a portion of which was returned, transferred or paid to Wells or an

16            affiliate;

17       c.    Whether Defendant was unjustly enriched by charging their residential borrowers

18            amounts for force-placed insurance procured from QBE and ASIC, a portion of which

19            was returned, transferred or paid to Wells or an affiliate;

20       d.    Whether Defendant converted funds owned by borrowers by withdrawing such funds

21            from borrowers' escrow accounts and requiring borrowers to pay to replenish their

22            escrow accounts in order to pay the premiums for force-placed insurance procured

23            from QBE and ASIC, a portion of which was returned, transferred or paid to Wells or

24

an affiliate;

e.  Whether Defendant acted unfairly by entering into exclusive buying arrangements with QBE and ASIC in order to receive kickbacks of a portion of insurance premiums paid to QBE and ASIC for force-placed insurance policies;

f.  Whether Wells Fargo's practices are unusual within the meaning of the BHCA;

g.  Whether Wells Fargo tied the services of its affiliate to its provision of force-placed insurance;

h.  Whether Wells Fargo should be enjoined from continuing to receive kickbacks from QBE and ASIC and withdrawing the amounts of these kickbacks from borrowers' escrow accounts.

84.  Plaintiffs' claims are typical of the claims of other members of the Classes. Plaintiffs Danny and Beverly Lane and Mercedes Guerrero, like all Class members, were charged for backdated force-placed insurance procured without seeking competitive bids on the open market by Wells Fargo from QBE and ASIC to insure property secured by a residential mortgage originated, owned or serviced by Wells. Plaintiffs, like all Class members, sustained damages based on the same actions of Wells and have no interest antagonistic to the interests of any members of the Classes.

85.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of complex litigation and consumer class actions. Plaintiffs and their counsel will fairly and adequately protect the interests of the Classes.

86.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendant, Class members cannot realistically afford to seek legal redress individually for the claims alleged herein. Therefore,

absent a class action, members of the Classes have no realistic likelihood of recovering their damages, and Wells Fargo's wrongful practices alleged herein will continue unabated.

87.     Even if members of the Classes could afford to pursue individual litigation, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. In contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court. Thus, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually. There will be no difficulty in the management of this action as a class action.

88.     Wells Fargo has acted or failed to act in a manner generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT, INCLUDING THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

89.     Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

90.     Plaintiff Mercedes Guerrero brings her breach of contract, including the implied covenant of good faith and fair dealing, claim on behalf of herself and all persons whose FHA mortgage loans were owned or serviced by Wells Fargo who (1) were charged for force-placed insurance, or (2) were force-placed into backdated force-placed insurance (Class 2 above).

91.     Plaintiffs Danny Lane and Beverly Lane bring their breach of contract, including the implied covenant of good faith and fair dealing, claim on behalf of themselves and all persons whose Fannie Mae/Freddie Mac uniform mortgage loans were owned or serviced by Wells Fargo who (1) were charged for force-placed insurance, or (2) were force-placed into back-dated force-placed insurance (Class 3 above).

92.     Wells Fargo's actions as mortgage servicer constitute a breach of the express terms of Plaintiffs' mortgages and breach of the implied covenant of good faith and fair dealing.

93.     Section 3 of Danny and Beverly Lane's mortgage governs how a mortgage lender should apply funds for items paid out of escrow, such as flood and hazard insurance premiums. Section 3 states that the "Lender shall not charge Borrower for holding and applying Funds" to escrowed items. Wells Fargo's kickback scheme violates this provision by charging borrowers a fee, which it calls a "commission," for doing nothing more than paying ASIC and QBE force-placed insurance premiums. Wells Fargo breached Section 3 of Danny and Beverly Lane's mortgage when it accepted kickbacks from QBE.

94.     Section 8 of Mercedes Guerrero's mortgage governs all fees that a mortgage lender or servicer may charge a borrower under Ms. Guerrero's FHA mortgage. Section 8 authorizes Wells Fargo to "collect fees and charges authorized by the Secretary." The Secretary of Housing and Urban Development does not allow a mortgage servicer to collect compensation in connection with force-placed insurance where that compensation is unearned. Wells Fargo breached Section 8 of Mercedes Guerrero's mortgage when it accepted kickbacks from ASIC.

95.     Section 5 of Danny and Beverly Lane's mortgage governs the parties' rights and obligations concerning all forms of homeowners' insurance. Paragraph 5 requires Plaintiffs to obtain flood and hazard insurance "in the amounts . . . and for the periods that Lender requires." Section 4 of

Mercedes Guerrero's mortgage contains substantively similar language ("This insurance shall be maintained in the amounts and for the periods that Lender requires."). However, neither mortgage authorizes Wells Fargo to charge borrowers for the amount of kickbacks it receives from ASIC and QBE.

96.     Section 5 of Danny and Beverly Lane's mortgage also requires the borrower to acknowledge "that the cost of the [force-placed] Insurance coverage . . . might significantly exceed the cost of insurance that Borrower could have obtained." Wells Fargo's scheme to intentionally inflate the "cost" of this insurance through its exclusive purchasing arrangements with QBE and ASIC violate this provision. Moreover, Wells Fargo's kickbacks cannot reasonably be construed as part of the "cost" of force-placed insurance. Charging Plaintiffs for Wells Fargo's kickbacks violates this provision of Plaintiffs' mortgages. Section 5 does not contain the word "commission" or any other explicit or implicit authorization for the payment of any remuneration to Wells or its affiliates for the purchase of force-placed insurance. Wells Fargo breached Section 5 of Danny and Beverly Lane's mortgage when it accepted kickbacks from QBE.

97.     Section 9 of Danny and Beverly Lane's mortgage, and section 7 of Mercedes Guerrero's mortgage govern the Lender's rights when the borrower fails to abide by any covenant contained in the mortgage, including the requirement to maintain adequate insurance.

98.     Section 9 of Danny and Beverly Lane's mortgage states that if the borrower does not maintain adequate insurance "Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the property and rights under this Security Instrument . . . ." It is not "reasonable or appropriate to protect Lender's interest in the property and rights under this Security Instrument" for Wells Fargo to charge Plaintiffs and Class members for "commissions" and other unearned remuneration paid to Wells Fargo and its affiliates. Wells Fargo's decision to force-place

insurance with a company that guaranteed it kickbacks is not "reasonable or appropriate to protect Lender's interest in the property and rights under this Security Instrument." Wells Fargo breached Section 9 of Danny and Beverly Lane's mortgage when it accepted kickbacks from QBE.

99.     Section 7 of Mercedes Guerrero's mortgage states that if the borrower does not maintain adequate insurance "Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2." It is not "necessary to protect the value of the Property and Lender's rights in the property" for Wells Fargo to charge Ms. Guerrero and Class members for "commissions" and other unearned remuneration paid to Wells Fargo and its affiliates. Wells Fargo's choice to force-place insurance with a company that guaranteed it kickbacks is not "necessary to protect the value of the Property and Lender's rights in the property." Wells Fargo breached Section 7 of Mercedes Guerrero's mortgage when it accepted kickbacks from ASIC.

100.     Wells Fargo breached Plaintiffs' mortgages by force-placing backdated insurance policies to increase the number and amount of kickbacks it could receive from them, and requiring Plaintiffs to pay force-placed insurance premiums that included these kickbacks.

101.     Section 9 of Danny and Beverly Lane's mortgage limits Wells Fargo's right to force-place insurance to "whatever is reasonable or appropriate to protect Lender's interest in the property and rights under this Security Instrument . . . ." It is not "reasonable and appropriate to protect Lender's interest in the property and rights under this Security Instrument" to force Danny and Beverly Lane to pay for retroactive insurance covering periods where no claims have accrued. Wells Fargo breached Section 9 of Danny and Beverly Lane's mortgage when it force-placed backdated insurance on their property.

102.     Section 7 of Mercedes Guerrero's mortgage limits Wells Fargo's right to force-place

insurance to "whatever is necessary to protect the value of the Property and Lender's rights in the property." It is not "necessary to protect the value of the Property and Lender's rights in the property" to force Mercedes Guerrero to pay for retroactive insurance covering periods where no claims have accrued. Wells Fargo breached Section 7 of Mercedes Guerrero's mortgage when it force-placed backdated insurance on her property.

103.    The implied covenant of good faith and fair dealing is part of every contract. While the implied covenant cannot override an express contractual term, it attaches to the performance of a specific contractual provision. The duty to act in good faith limits one party's ability to act in a manner that contravenes the reasonable and justifiable expectations of the other party. When a contract is silent as to the permissibility of certain conduct related to the performance of an express term of a contract, the covenant is used as a "gap-filling" tool.

104.    Section 5 of Danny and Beverly Lane's mortgage, and Section 7 of Mercedes Guerrero's mortgage give Wells Fargo substantial discretion in the selection of the insurance company and rate for force-placed insurance policies if the borrower allows their insurance to lapse. Wells Fargo is permitted by the contract to force-place insurance with the company of its choice. The "gap" that the covenant of good faith and fair dealing fills is the manner in which Wells Fargo may go about implementing this express term. Specifically, whether Wells Fargo may permissibly set up an exclusive buying arrangement with its chosen insurer where the insurer kicks back a portion of the cost of coverage to Wells Fargo is governed by Wells Fargo's obligation of good faith and fair dealing.

105.    Wells Fargo exercised its discretion capriciously, in bad faith, and in contravention of the parties' reasonable expectations, violating the covenant of good faith and fair dealing in at least the following respects:

a.  Charging a "cost" to Plaintiffs and Class members for force-placed insurance that includes a kickback paid to Wells or its affiliates;

b.  Charging Plaintiffs and Class members for commissions when the insurance is prearranged and no commission is due;

c.  Collecting a percentage of whatever premiums are charged to Plaintiffs and the Classes and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

d.  Failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby the insurance policies are repeatedly purchased through the same companies without seeking a competitive price; and

e.  Purchasing backdated force-placed insurance policies to increase the number of kickbacks Wells Fargo is able to receive.

106.  Plaintiffs and the Classes have sustained damages as a result of Wells Fargo's breach of contract and breach of the implied covenant of good faith and fair dealing, represented by the amount of the hidden profit or financial benefit earned by Wells or its affiliate on force-placed insurance procured through QBE and ASIC, and excess insurance premiums Class members paid as a result of Wells Fargo's exclusive business deals and policy of force-placing backdated insurance.

107.  Plaintiffs and the Class are entitled to compensation equal to the amount of their damages. Plaintiffs and the Class are entitled to an injunction prohibiting Wells Fargo from charging them for kickbacks, the excess costs resulting from Wells Fargo's exclusive dealing arrangements, and backdated force-placed insurance.

## COUNT II
## UNJUST ENRICHMENT (RESTITUTION)

108.  Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

109.  Plaintiff Mercedes Guerrero brings her unjust enrichment (restitution) claim on behalf of herself and all persons with homes in the state of California with loans serviced by Wells Fargo

1    who were charged for force-placed insurance premiums that included Wells Fargo's kickbacks (Class

2    4 above).

3         110.    Plaintiffs Danny and Beverly Lane bring their unjust enrichment claim on behalf of all

4    persons with homes in the state of Arkansas with loans serviced by Wells Fargo who were charged

5    for force-placed insurance premiums that included Wells Fargo's kickbacks (Class 5 above).

6         111.    Plaintiffs' mortgages do not directly address commissions, fees, or other remuneration

7    paid to Wells Fargo or any affiliate of Wells Fargo in connection with force-placed insurance. Wells

8    Fargo's kickback scheme is not plainly governed by Plaintiffs' mortgages.

9         112.    Plaintiffs' unjust enrichment claims against Wells Fargo arise from Wells Fargo's

10   illegal practice of earning a hidden profit or other financial benefit by collecting money from

11   residential borrowers for the exorbitant insurance premiums for force-placed flood and hazard

12   insurance policies procured through QBE and ASIC where a portion of the above-market rate

13   premiums were returned to Wells and its affiliates. This secret kickback arrangement monetarily

14   benefited Wells and its affiliates at the direct expense of the Plaintiffs.

15        113.    Wells Fargo enjoyed and accepted monetary or other financial benefits from QBE and

16   ASIC by accepting kickbacks paid to Wells Fargo or its affiliates out of the exorbitant above-market

17   rates being charged to the Plaintiffs under this secret kickback arrangement.

18        114.    Wells Fargo and its affiliates were unjustly enriched, in an amount to be proven at

19   trial, by receiving a portion of each force-placed flood and hazard insurance premium paid by

20   Plaintiffs and Class members. It would be inequitable to allow Wells to retain these benefits at the

21   expense of Plaintiffs and the Classes.

22        115.    Wells Fargo should compensate Plaintiffs and the Classes in an amount equal to all

23   payments collected from Plaintiffs and the Classes that represent the hidden profits or other financial

24

benefits received by Wells or its affiliates. Plaintiffs seek an injunction ordering Wells Fargo to disgorge all such profits to Plaintiffs and members of the Classes.

116. Wells Fargo and its affiliates received and are holding funds belonging to Plaintiffs and the Classes, which in equity and good conscience they should not be permitted to keep.

**COUNT III**
**CONVERSION**

117. Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

118. Plaintiff Mercedes Guerrero brings her conversion claim on behalf of herself and all persons with homes in the state of California with loans serviced by Wells Fargo who were charged for force-placed insurance premiums that included Wells Fargo's kickbacks (Class 4 above).

119. Plaintiffs Danny and Beverly Lane bring their conversion claim on behalf of all persons with homes in the state of Arkansas with loans serviced by Wells Fargo who were charged for force-placed insurance premiums that included Wells Fargo's kickbacks (Class 5 above).

120. Plaintiffs' mortgages do not directly address commissions, fees, or other remuneration paid to Wells Fargo or any affiliate of Wells Fargo in connection with force-placed insurance. Wells Fargo's kickback scheme is not plainly governed by Plaintiffs' mortgages.

121. Plaintiffs bring their conversion claims against Wells Fargo for taking a portion of Plaintiffs' force-placed insurance premiums.

122. Wells Fargo improperly exercises control of the property of Plaintiffs and Class members by imposing improper kickbacks and charges on Plaintiffs' and Class members' escrow accounts and collecting those kickbacks. For example, Wells Fargo required Plaintiffs to increase their mortgage payments to pay for QBE's and ASIC's insurance premiums and Wells Fargo's kickbacks and retained these readily identifiable funds. This exercise of control is contrary to the

29

rights of Plaintiffs and members of the proposed Classes.

123. The acts of Wells Fargo constitute the tort of conversion.

124. Plaintiffs and members of the proposed Classes are entitled to the immediate possession of fees improperly collected by Wells Fargo, and are entitled to a release of all escrow charges for the improper fees.

125. Wells Fargo wrongfully converted specific and readily identifiable funds.

126. As a direct and proximate result of Wells Fargo's acts of conversion, Plaintiffs and members of the proposed Classes have suffered and continue to suffer damages and are entitled to compensation in the amount of their damages, to be determined at trial.

**COUNT IV**
**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, *et seq.***

127. Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

128. Plaintiff Mercedes Guerrera brings her section 17200 claim on behalf of herself and all California residents who were (1) charged for force-placed insurance premiums that included kickbacks to Wells Fargo or its affiliates, or (2) force-placed into backdated force-placed insurance (Class 6 above).

129. Wells Fargo was required to adhere to the requirements of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*. ("UCL"), when conducting business with Plaintiff Mercedes Guerrera and other California residents.

130. The UCL prohibits any "unlawful" business act or practice. Wells Fargo has violated the UCL's prohibition against engaging in unlawful acts or practices by violating statutes and common law rules prohibiting Wells Fargo's conduct as described herein, including:

    a. Wells Fargo's breach of contract, including its breach of the implied covenant

of good faith and fair dealing;

b.  Wells Fargo's conversion;

c.  Wells Fargo's unjust enrichment; and

d.  Wells Fargo's violations of the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C. § 1972 et seq.

Plaintiffs reserve the right to allege other violations of law that constitute other unlawful business acts or practices.

131.   The UCL also prohibits any "unfair" business act or practice.  As detailed in the preceding paragraphs, Wells Fargo engaged in unfair business acts or practices by, among other things, charging California residents for force-placed insurance premiums that included kickbacks to Wells Fargo, and by force-placing California residents into backdated insurance policies.

132.   Wells Fargo systematically engaged in these unfair and unlawful business practices to the detriment of Plaintiff Mercedes Guerrero and other California borrowers.

133.   The harm caused by these business practices vastly outweighs any legitimate business utility they possibly could have.

134.   Mercedes Guerrero and other California borrowers have been injured and have suffered a monetary loss as a result of Defendant's violations of the UCL. They are entitled to restitution in an amount to be determined at trial, and an injunction requiring Wells Fargo to cease its unlawful and unfair business practices as described herein.

135.   As a result of Defendant's violations of the UCL, Plaintiffs are also entitled to recover attorneys' fees and costs to be paid by Defendant, as provided by Cal. Code of Civil Procedure § 1021.5 and other applicable law.

## COUNT V
## VIOLATIONS OF THE ANTI-TYING PROVISIONS OF THE BANK HOLDING

31

**COMPANY ACT (12 U.S.C. § 1972, *et seq.*)**

136.    Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word.

137.    Plaintiffs Danny Lane, Beverly Lane, and Mercedes Guerrera bring their Bank Holding Company Act claim on behalf of themselves and all persons in the United States who were charged for force-placed insurance premiums that included a "commission" or kickback to Wells Fargo Insurance, Inc., Wells Fargo, or any other affiliate of Wells Fargo (Class 1 above).

138.    Wells Fargo's kickback scheme violates the anti-tying provisions of the Bank Holding Company Act, 12 U.S.C. § 1972, *et seq.*

139.    12 U.S.C. § 1972(b) of the Bank Holding Company Act (BHCA) states "a bank shall not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement . . . (B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company."

140.    Wells Fargo is a bank, and its holding company is Wells Fargo & Company.

141.    Wells Fargo Insurance, Inc. (WFI) is a wholly owned subsidiary, whether directly or indirectly, of Wells Fargo & Company.

142.    Wells Fargo's purchase of insurance on borrowers' behalf is a service that Wells Fargo offers to its borrowers. To accept this service, borrowers must agree to pay commissions to WFI for unidentified services.

143.    Wells Fargo and WFI entered into exclusive purchasing agreements with QBE and ASIC. Under these agreements, ASIC, QBE, and Wells Fargo agreed that WFI would act as the "broker" or "agent" for 100% of force-placed insurance policies purchased on behalf of Wells

Fargo's borrowers. Under these agreements WFI received a guaranteed commission for every force-placed insurance policy procured on behalf of Wells Fargo's borrowers equal to 10% to 20% of the premium for each policy.

144.    WFI does not engage in any insurance broker or agent services. For example, it does not seek out competitive insurance policies from different insurance providers, but refers all force-placed insurance business to QBE and ASIC. WFI provides no services whatsoever for borrowers.

145.    This is an "unusual" banking practice. Under the BHCA, an "unusual" banking practice is one that is not traditional within the banking industry. What is "unusual" about Wells Fargo's force-placed insurance practices is that Wells Fargo's exclusive purchase agreements with QBE and ASIC obviated any opportunity for WFI to earn a commission from borrowers. Wells Fargo requires borrowers to pay for services that WFI provides to Wells Fargo, QBE and ASIC. WFI provides no services for borrowers themselves. In a "traditional" or "usual" setting, WFI would search for the best available or lowest cost insurance policy available for each borrower requiring force-placed insurance, instead of always purchasing the highest price, lowest coverage policies from QBE and ASIC.

146.    Fannie Mae recently amended its policies regarding force-placed insurance to explicitly prohibit mortgage servicers servicing loans owned by Fannie Mae from charging borrowers for any lender-placed insurance commission earned on a force-placed insurance policy by the servicer or any related entity, or costs associated with insurance tracking or administration. Fannie Mae directed its servicers to exclude charges for commissions to servicer-affiliated insurance agents from force-placed insurance charges. This is further evidence that Wells Fargo's practices are "unusual."

147.    Wells Fargo's practices are anti-competitive.

a.    Wells Fargo, QBE, and ASIC refer all force-placed insurance agency business to WFI and guarantee WFI's commissions. The commissions paid to WFI are based on

contracts between Wells Fargo, QBE, and ASIC, not on any services actually provided by WFI. WFI has no competitive incentive to provide any services on behalf of borrowers.

b.      Wells Fargo unilaterally sets the commission amount that WFI will receive. The substantial revenues QBE and ASIC receive in premiums from Wells Fargo's borrowers give them an incentive to agree to any commission rate that Wells Fargo demands for WFI.

c.      Wells Fargo's tying arrangement results in unreasonably high commissions to WFI. The commissions are a percentage of QBE's and ASIC's premiums. QBE and ASIC provide more limited insurance policies than borrowers can obtain on the market but cost more than twice as much as other policies the borrowers would obtain on the open market. Wells Fargo's agreements allow WFI to receive more than twice the commission any other insurance agent would receive for procuring more limited insurance than any other insurance agent would procure.

d.      Unlike regular insurance agency arrangements, Wells Fargo utilizes its power as borrowers' mortgage lender or servicer to guarantee payment of WFI's commissions. Wells Fargo withdraws insurance premiums and commissions directly from borrowers' escrow accounts to pay commissions to its holding company's subsidiary, WFI. If borrowers refuse to make increased payments to their escrow account, Wells Fargo coerces them into doing so with negative credit reporting and, potentially, foreclosing on their homes. Wells Fargo uses its power as borrowers' bank to steer commissions to WFI.

e.      In some cases, the borrower immediately obtains insurance as Wells Fargo demands in order to avoid being force-placed into insurance at abnormally high premiums. However, Wells Fargo further guarantees commission payments to WFI by reserving sole discretion to define any portion of the commission as "earned." For example, when a borrower obtains insurance to meet Wells Fargo's requirements, Wells Fargo can determine that a portion of the force-placed insurance premium was "earned" and simply refuse to return this portion of the premium to the borrower. WFI would keep a portion of this "earned" premium. Wells Fargo uses its control of funds in borrowers' escrow account—its power as a bank—to steer commissions to WFI.

f.      Wells Fargo's force-placed insurance arrangement usurps market share from other insurance agencies in favor of WFI. Force-placed insurance may be a more costly option than purchasing insurance on the open market, but it is a significantly easier and less demanding option. Hundreds of thousands of homeowners in the United States have allowed Wells Fargo to purchase force-placed insurance on their property, resulting in tens of millions of dollars in commissions being paid to WFI.

g.      Wells Fargo's exclusive purchase arrangement and kickback scheme artificially inflate the price of force-placed insurance and artificially increase commissions paid to Wells Fargo's captive insurance agent, WFI. The artificially inflated price of QBE's and

ASIC's force-placed insurance is only possible because Wells Fargo refers 100% of its force-placed insurance business to QBE and ASIC. This grants them a captive and highly lucrative market. As one of the nation's largest mortgagees and mortgage servicers, Wells Fargo's exclusive force-placed insurance referrals can and do substantially affect competitive incentives to reduce prices. This guarantees distorted commissions to WFI, whose commissions are a percentage of QBE's and ASIC's inflated premiums.

148.    The "tied product" in this arrangement is WFI's "service" of acting as an insurance agent for force-placed insurance.

149.    The "tying product" is Wells Fargo's service of purchasing insurance on borrowers' behalf. The tie is also effectuated through language in the mortgage that allows Wells Fargo to foreclose on borrowers who refuse to pay WFI's "commissions." This conditions Wells Fargo's continued extension of credit on borrowers agreeing to accept WFI's "services."

150.    Wells Fargo ties the procurement of insurance on borrowers' behalf to WFI's "services" as insurance agent as alleged above.

151.    Section 22 of Plaintiffs' mortgages allows Wells Fargo to rescind its extension of credit and foreclose on Plaintiffs' property if Plaintiffs fail to pay commissions to WFI that Wells Fargo determines WFI earns. The continuing extension of credit is conditioned on Plaintiffs agreeing to accept WFI as the insurance agent for force-placed insurance and pay any commissions Wells Fargo determines are owed.

152.    Wells Fargo benefits directly and indirectly from this tying arrangement. The vast majority of commissions paid to WFI are remitted directly to Wells Fargo in the form of "soft dollar" transactions, whereby WFI's compensation for other services provided to Wells Fargo is reduced by the amount of commissions received by WFI (reducing Wells Fargo's debts to WFI). Moreover, Wells Fargo receives an indirect benefit when WFI's profits are remitted to Wells Fargo & Company, which provides increased capital investments and other monetary benefits to Wells Fargo.

153.     Plaintiffs and members of the Classes have been damaged by Wells Fargo's anti-competitive tying arrangement in that they have paid excessive commissions to Wells Fargo & Company's subsidiary, WFI.

154.     12 U.S.C. § 1975 states "[a]ny person who is injured in his business or property by reason of anything forbidden in section 1972 of this title may sue therefore in any district court of the United States in which the defendant resides or is found or has an agent." Section (e) of the BHCA allows any person injured by an unlawful tying arrangement to file an action for actual damages, entitles such a person to three times the actual damages sustained, and allows for the cost of the suit and attorneys' fees. Section (f) authorizes injunctive relief.

155.     Plaintiffs request that this Court find Wells Fargo in violation of 12 U.S.C. § 1972, *et seq.*

156.     Plaintiffs and members of the proposed Classes are entitled to three times the amount of damages sustained by them, and the cost of suit, including a reasonable attorney's fee pursuant to 12 U.S.C. § 1975. Plaintiffs are further entitled to an injunction barring Wells Fargo from continuing their unlawful conduct, including any continuing exclusive purchasing arrangements with QBE and ASIC, and kickback scheme with WFI. Plaintiffs seek an injunction requiring Wells Fargo to exclude the amount of any commissions paid to WFI from charges withdrawn from class members' escrow accounts to pay for force-placed insurance.

## RELIEF SOUGHT

### *EQUITABLE REMEDIES*

157.     Plaintiffs restate and reallege the preceding paragraphs of this Complaint as though set out here word for word and request equitable relief from the Court.

158.     Plaintiffs have no adequate remedy at law to address the wrongful conduct engaged in

by Defendant. Thus Plaintiffs ask the Court to enjoin the Defendant from the practice of collecting "commissions" and other unearned compensation for the force-placement of insurance on the grounds that the fees are neither disclosed nor permitted by Class Members' mortgage contracts. Plaintiffs ask that the Court order Wells Fargo to disgorge all "commissions," kickbacks, or other fees associated with force-placed insurance to Plaintiffs and members of the Classes. Plaintiffs further ask the Court to enjoin the Defendant from continuing its exclusive purchase arrangements and "commission" agreements with QBE and ASIC.

159.    Plaintiffs ask the Court to award restitution to return all charges Defendant or their affiliates received in connection with the purchase of force-placed insurance.

160.    Plaintiffs ask the Court to order Defendant to remove from Class Members' escrow accounts all charges that are attributable to kickbacks paid to Defendant or their affiliates for the purchased of force-placed insurance.

### *DAMAGES*

161.    Defendant should pay damages to Plaintiffs and the Classes in an amount to be determined at trial according to law, in any event, in excess of five million dollars ($5,000,000). Plaintiffs and members of the proposed Classes are entitled to treble damages under the BHCA, and punitive damages or additional damages allowed by statute for Defendant's knowing and intentional violation of laws or actions taken in wanton and reckless disregard for the harm caused to Plaintiffs and members of the proposed Classes.

### **DEMAND FOR JURY TRIAL**

162.    Plaintiffs, on behalf of themselves and all others similarly situated, demand a trial by jury of all matters so triable.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and other members of the Classes, demand judgment against Wells Fargo as follows:

(1)     Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b) of the Federal Rules of Civil Procedure and declaring Plaintiffs to be the representatives of the Classes;

(2)     Awarding damages sustained by Plaintiffs and the Classes as a result of Wells Fargo's breach of contract, including the implied covenant of good faith and fair dealing, together with prejudgment interest;

(3)     Finding that Wells Fargo has been unjustly enriched and requiring Wells Fargo to refund all unjust benefits to Plaintiffs and the Classes, together with prejudgment interest;

(4)     Finding that Wells Fargo committed the tort of conversion by withdrawing and retaining borrowers' funds from borrowers' escrow accounts to pay for insurance premiums that included wrongful charges for kickbacks paid to Wells Fargo or its affiliates, and requiring Plaintiffs and members of the Classes to replenish their escrow accounts after the withdrawal of these wrongful charges;

(5)     Finding that Defendant violated the California Unfair Competition Law;

(6)     Finding that Wells Fargo violated the Bank Holding Company Act;

(7)     Awarding Plaintiffs and members of the proposed Classes the maximum amount of damages allowable under applicable law along with pre-judgment interest as allowed by applicable law;

(8)     Granting all relief described above;

(9)     Granting a trial by jury of all issues so triable;

(10)     Awarding Plaintiffs and the Classes costs and disbursements and reasonable

1    allowances for the fees of Plaintiffs' and the Classes' counsel and experts, and reimbursement

2    of expenses; and

3    (11)    Such other and further relief as the Court deems just and equitable.

4    Dated: March 21, 2013                    Respectfully submitted,

5                                              _/s/ Sheri Kelly_____
                                             Sheri L. Kelly, SBN 226993
6                                            LAW OFFICE OF SHERI L. KELLY
                                             31 E. Julian St.
7                                            San Jose, CA  95112
                                             Telephone:  408/287-7712
8                                            Facsimile:  408/583-4249
                                             slk@sherikellylaw.com
9
                                             Steven A. Owings (*Pro Hac Vice*)
10                                           Alexander P. Owings (*Pro Hac Vice*)
                                             OWINGS LAW FIRM
11                                           1400 Brookwood Drive
                                             Little Rock, AR 72202
12                                           Telephone: (501) 661-9999
                                             Facsimile: (501) 661-8393
13                                           sowings@owingslawfirm.com
                                             apowings@owingslawfirm.com
14
                                             Brent Walker (*Pro Hac Vice*)
15                                           Russell Davis Carter III (*Pro Hac Vice*)
                                             CARTER WALKER PLLC
16                                           2171 West Main, Suite 200
                                             P.O. Box 628
17                                           Cabot, AR 72023
                                             (501) 605-1346
18                                           (501) 605-1348 (facsimile)
                                             bwalker@carterwalkerlaw.com
19                                           dcarter@carterwalkerlaw.com

20                                           Jack Wagoner, (*Pro Hac Vice*)
21                                           Angela Mann (*Pro Hac Vice*
                                             WAGONER LAW FIRM, P.A.
22                                           1320 Brookwood, Suite E
                                             Little Rock, AR 72202
23                                           Telephone: (501) 663-5225
                                             Facsimile: (501) 660-4030
24                                           jack@wagonerlawfirm.com

*FIRST AMENDED COMPLAINT*
*CASE NO. CV-12-04026 WHA*

angela@wagonerlawfirm.com

**Counsel for Plaintiffs**